UNITED STATES of America, Plaintiff-Appellee,

v.

Fred G. AMICK et al., Defendants-Appellants.

Nos. 17084–17087, 17089–17095.

United States Court of Appeals, Seventh Circuit.

Jan. 22, 1971.

As Amended on Denial of Rehearing in No. 17091 March 29, 1971.

Stanley B. Miller, U. S. Atty., Indianapolis, Ind., William Hegan, Chicago, Ill., K. Edwin Applegate, U. S. Atty., for plaintiff-appellee; Burton H. Finkelstein, E. George Perdix, Joan H. Saxer, James J. Sexton, III, Attys., S.E.C., Washington, D. C., of counsel.

Vance M. Waggoner, Rushville, Ind., Duge Butler, Jr., Earl N. Davis, Howard J. DeTrude, Jr., Erle A. Kightlinger, Robert A. Garelick, Sidney Mishkin, Alan I. Klineman, James W. Bradford, John D. Raikos, Thomas W. McKean, Indianapolis, Ind., Jerome B. Van Orman, Fort Wayne, Ind., for defendants-appellants; Kightlinger, Young, Gray & Hudson, Raikos, Rockford, Melangton & Dougherty, Indianapolis, Ind., of counsel.

Before FAIRCHILD, CUMMINGS and KERNER, Circuit Judges.

FAIRCHILD, Circuit Judge.

These are appeals by eleven individuals and two corporations from judgments of conviction of violations of 15 U.S.C. § 77q (Section 17 of the Securities Act of 1933, Fraudulent interstate transactions). Eight of the individual appellants and the corporations were convicted by a jury.[1] The other three individual appellants were convicted upon pleas of nolo contendere. Others were named in the indictment, but entered pleas or had separate trials, and are not involved on these appeals.

The charges arose out of sales of the common stock of Air & Space Underwriters, Inc. (ASU). ASU was newly formed and contemplated a business (through a subsidiary) of manufacturing and selling gyroplanes. A gyroplane is similar to a helicopter in that each has a rotor wing. The gyroplane's rotor, when in flight, is free wheeling and not powered. Forward motion is generated by a propeller. A helicopter's rotor, on the other hand, is powered in flight and has forward motion as a result. ASU took over the development of the gyroplane from Umbaugh Aircraft Corporation pursuant to a plan of reorganization of that company, approved in a Chapter X proceeding by a federal district court in Florida. There is evidence that the gyroplane to be produced could land and take off without a runway, and could carry a passenger in addition to the pilot. It was hoped that it could be produced at a price which would make it feasible for various types of business and personal transportation uses.

ASU stock was sold to investors in Indiana from August 14, 1963 until July, 1965 when the SEC obtained an injunction. The prices paid by investors during this period aggregated $2.1 million. 15 gyroplanes were produced and sold.

It appears, virtually beyond dispute, that during this period the effort to promote sales of ASU stock included general releases and individual communications which contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and included devices to defraud and practices which would operate as a fraud upon the purchaser. The areas of misrepresentation included the price at which the plane could be sold, progress toward production, orders on hand, and the financial history and con-

---

1. Another corporation, convicted by the jury, has not appealed.

dition of ASU. The details will not be stated except as required in discussion of particular counts. There was abundant evidence of pattern of conduct, plan, and design from which a jury could find that the false and misleading assertions, to the investing public by way of the media, including the Indiana Investor in particular, and to prospective purchasers by sales literature and individual sales efforts, constituted a scheme to defraud, changing in content from time to time. The ultimate question is whether the appellants were properly found criminally responsible for wilfully having employed such scheme or wilfully having obtained money by means of such misrepresentations.

Appellants challenge the indictment on several grounds, and make other attacks on procedure. Those who stood trial argue that the evidence was insufficient to support the respective guilty verdicts.

■ 1. *The challenge to the array of the grand jury.* All appellants contend that the grand jury which indicted them was unlawfully selected. Appellants who stood trial assert the same defect with respect to the petit jury. The challenge is made to an early step in the system by which most names were selected for the jury list from which the names of veniremen were drawn. Documents were placed before the district court in support of and opposition to the challenge. Most of them were the same as those described and considered by Chief Judge Steckler of the same court in overruling a similar challenge at about the same time.[2]

Appellants rely principally on statements appearing in Rabinowitz v. United States[3] although there was no showing in the instant case suggesting the virtual exclusion or gross under-representation on the jury list of any group or class of residents of the district or division.

The names of prospective grand jurors were drawn from among 1,200 names, at least 300 being on the jury list in each of four divisions. The names of prospective petit jurors were drawn from the 300 on the list in the Indianapolis division. The division lists were maintained at 300 by addition from time to time of names of persons who had answered questionnaires and been found qualified and not exempt. Most of the names of the larger number to whom the questionnaires had been sent were supplied by so-called key men who were asked by the clerk and jury commissioner to supply them.

As needed, the clerk and jury commissioner sent a form letter to key men in the counties in the district. According to an affidavit by the clerk, the key men were persons "who were thought to be widely acquainted with persons of diverse backgrounds within their own communities, and were most likely to suggest jurors representing a fair cross section of such communities."

The form letter soliciting suggestions was before the court. It stated in part that jurors must be "capable and impartial and * * * selected without regard to race, color, creed, politics or station of life." The recipient was asked "to suggest the names of men and women in your community who, in your judgment, would make qualified jurors." A sheet setting forth 28 U.S.C. §§ 1861 and 1862, listing qualifications and exemptions, was enclosed and it was said, "In making your suggestions please refer to the statutory requirements set forth on the attached sheet." Apparently about 140 key men had responded to such letters in the course of three years.

In November, 1966 several individuals interviewed 79 key men concerning the type of persons whose names each had suggested and prepared affidavits summarizing the interviews. These affidav-

2. United States v. Duke (S.D.Ind., 1967), 263 F.Supp. 828.

3. (5th Cir., 1966), 366 F.2d 34. In a later decision, Mobley v. United States (1967), 379 F.2d 768, 773, the fifth circuit stated that in *Rabinowitz* "we did not thus declare the 'key man' selection system illegal as such."

its were before Judge Dillin as they had been before Judge Steckler. It seems fair to say in summary that most or all the key men said they had some standard in mind as to who would make a "responsible" juror. Indeed, any form of key man system of suggestion would almost necessarily involve the application of some subjective standard of that type. We do not consider, however, that either constitutional concepts or any statutes applicable in 1966 or 1967 compelled a purely random selection from the whole body of qualified persons in the community.[4]

It appears from the affidavits that several key men acknowledged that they had not suggested names of persons belonging to particular groups or classes. Some of the reasons, e. g., that jury duty would be a hardship on poorly paid workers, that men make better jurors than women, and that young adults are too immature, would tend to establish invalidity if such reason were found to have guided most or a substantial group of key men, but we deem the degree to which these reasons operated among the total number interviewed was clearly insubstantial.

The district court, in overruling the challenge, concluded that the key man system was not invalid per se, and that the affidavits neither established exclusion of classes of qualified persons nor made a showing sufficient to require further inquiry. We agree.

2. *Challenges to form and sufficiency of indictment.* The first 38 counts of the indictment charged varying groups of defendants with violations of 15 U.S. C. § 77q(a). The outline is similar to the one discussed in United States v. Birrell.[5] Count 39 charged appellants Vollmer and Indiana Investor and Business News, Inc. (Indiana Investor) and others with violation of 15 U.S.C. § 77q (b) in publicizing ASU stock. Count 40

charged several defendants with violation of 15 U.S.C. 77e(a) (2) by mailing ASU stock without a registration statement being in effect. Count 41 charged all defendants with conspiring to commit the offenses charged in the other counts.

A number of the first 38 counts and count 40 were dismissed on motion of the government or for failure of proof. The jury acquitted various defendants on several counts among the first 38, and acquitted all defendants on count 41. The jury convicted Vollmer and Indiana Investor on count 39 and convicted one or more appellants on each of the remaining first 38 counts.

Each of the first 38 counts charged that several defendants, by the use of the mails in the offer and sale of ASU stock to a particular purchaser, wilfully (1) employed devices, schemes and artifices to defraud, (2) obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (3) engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit upon purchasers, including the purchaser named in the particular count. In each count, also, the date, addressee, and content of a mailed communication were alleged.

Each of the 38 counts contained a detailed description of the manner in which all defendants allegedly accomplished (1), (2), and (3) above referred to with respect to all purchasers of ASU stock, generally. The largest part of the description set forth the history of ASU, its acquisition of the Umbaugh company, the transactions by which particular defendants became interested as stockholders, directors, officers, or underwriters of ASU, and the amounts of stock sold during particular periods of time by

---

4. The indictment and trial preceded enactment of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1871, requiring a system of random selection from among those who vote or register to vote.

5. (S.D.N.Y., 1967), 266 F.Supp. 539.

named groups of defendants. At trial, there seems to have been little if any dispute about the background facts so alleged.

Paragraph 2 of this description set forth fourteen statements of fact which were alleged to be false and to have been wilfully made as part of the devices, schemes, and artifices to defraud and of the transactions, practices and courses of business operating as fraud. Paragraph 3 set forth ten statements of fact, alleged to have been omitted, but necessary to make the statements made not misleading. Each list was said not to be exclusive.

The detailed description just referred to alleged a course of conduct from May 15, 1963 to the date of the indictment, appeared as part of count 1, and was incorporated by reference in each of the following 37 counts.

Several attacks are made upon the indictment. We find no merit in them, and point them out briefly, as follows:

■ *Vagueness*: The indictment dealt with a subject matter sufficiently complex that care is required in reading it, but it is not vague. In each of the first 38 counts several defendants are charged in the terms of the statute with wilfully performing the proscribed acts in the offer and sale of ASU stock to a named purchaser, and the incidental use of the mails is described. As already mentioned, each count contained a general description of the background and a list, though not exclusive, of fraudulent statements and omissions, alleging conduct continuing generally throughout two years, although the transactions and some of the misrepresentations took place at different times within the two year period. The dates of mailing in all counts fell within that period.

The indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' " [6]

■ *Incorporation by reference:* It happened that count 1, in which the general description of the background and of the fraud was expressly set out, was dismissed for failure of proof. Several appellants contend that dismissal erased the count so that the portion of each other count incorporating part of count 1 by reference incorporated nothing. They claim it follows that without the incorporated part of count 1, all other counts ceased to charge an offense. The latter proposition is not clear but in any event we reject the argument that the counts must be read as if the incorporated material ceased to exist upon dismissal of count 1.

■ *Duplicity:* 15 U.S.C. § 77q(a) makes it unlawful, in the offer or sale of securities, by the use of the mails, to engage in certain conduct. The proscribed conduct is described as (1), (2) or (3).[7] Each count of the first 38 charges that defendants engaged in (1), (2), *and* (3). It is argued that each count charges three distinct offenses.

An answer was suggested by Crain v. United States.[8] There the "statute was

---

6. Hagner v. United States (1932), 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861.

7. "77q. *Fraudulent interstate transactions.*
 "(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
 "(1) to employ any device, scheme, or artifice to defraud, or

 "(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

8. (1896), 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097.

directed against certain defined modes for accomplishing a general object, and declaring that the doing of either one of several specified things, each having reference to that object, should be punished. * * * We perceive no sound reason why the doing of the prohibited thing in each and all of the prohibited modes, may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute."

The *Crain* rationale has, correctly, we think, been applied to the offenses now under consideration:

> "The statute thus embraces in the disjunctive three separate and distinct acts as a crime. The indictment charges the three offenses in the language of the statute, but they are charged in the conjunctive. An indictment charging a statutory offense must follow the statute creating it; but where the statute denounces several acts as a crime, they may be charged in one indictment or in a single count if they are connected in the conjunctive. An indictment drawn in that manner is not duplicitous, and it suffices to prove any one or more of the charges. [citing cases.]" [9]

█ *Multiplicity*: Appellants argue that the allowable unit of prosecution is participation in the allegedly fraudulent course of conduct, and that any particular use of the mails in connection with any particular sale is only a jurisdictional fact upon the basis of which participation in the overall course of con-

duct can be federally prosecuted; that the first 38 counts allege no more than one offense.

Courts have differed as to "the allowable unit of prosecution" [10] under this statute.

There is authority for the view (1) that, as is true of mail fraud, each separate use of the mails in the execution of a scheme to defraud in the sale of securities constitutes a separate offense; [11] (2) that each separate offer or sale transaction in which the proscribed conduct is employed and the mails used is the allowable unit; [12] (3) that where an indictment charges employment of proscribed conduct in separate transactions as separate counts, the determination whether there was one offense with several victims or a separate offense upon each victim can ordinarily not be made until proof is in; [13] (4) that where an indictment alleges a scheme to defraud and a number of separate mailings and sales in separate counts, but fails to show that the crime charged in any one count differs from that charged in the others, all counts are to be consolidated and all but one dismissed as separate counts. [14]

The counts in this indictment charged not only separate mailings, but separate sales, so that neither (1) nor (2) would require dismissal of any count. Under (3) dismissal before trial would be inappropriate, and the question need be considered only with respect to cumulative penalties on several counts. We consider (3) a sounder view than (4). [15] We

9. Troutman v. United States (10th Cir., 1938), 100 F.2d 628. 631–632.

10. United States v. Universal C. I. T. Credit Corp. (1952), 344 U.S. 218, 221. 73 S.Ct. 227, 97 L.Ed. 260.

11. Palmer v. United States (10th Cir., 1956), 229 F.2d 861, 867, cert. den. 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861.

12. Sanders v. United States (5th Cir., 1969), 415 F.2d 621, 626; United States v. Saporta (E.D.N.Y., 1967), 270 F.Supp. 183, 186. In this circuit it has been said that "the government must show some impact of the scheme on the investor and

that the mails were used in those instances where the impact occurred." United States v. Schaefer (7th Cir., 1962), 299 F.2d 625, 629.

13. United States v. Birrell (S.D.N.Y., 1967), 266 F.Supp. 539, 544.

14. United States v. Hughes (S.D.N.Y., 1961), 195 F.Supp. 795, 798.

15. Cf. United States v. Universal C. I. T. Credit Corp. (1952), 344 U.S. 218, 224, 73 S.Ct. 227, 97 L.Ed. 260; United States v. Ketchum (2d Cir., 1963), 320 F.2d 3, 7.

hold that the district court properly refused to dismiss or consolidate counts before trial, and shall give further consideration to the matter when we reach the claim that consecutive sentences were inappropriate.

3. *Joinder.* Various appellants contend that offenses and defendants were improperly joined, and that in any event discretionary severance should have been granted.

■ Rule 8(a) F.R.Cr.P. allows joinder of two or more offenses in separate counts in one indictment "if the offenses charged * * * are of the same or similar character or are based on * * * two or more acts or transactions connected together or constituting parts of a common scheme or plan." There can be no question of the propriety of joining the first 38 counts in one indictment. Count 39 charged wilfully, by use of the mails, giving publicity to and describing ASU stock for a consideration received from an issuer, underwriter, and dealer without fully disclosing the receipt and amount of the consideration. Count 40 (later dismissed) charged wilfully causing ASU stock, an unregistered security, to be carried through the mails for sale and delivery. Count 41 (upon which all appellants were acquitted) charged a conspiracy to commit the other offenses. All the substantive offenses were violations of the securities act, involved the same security, and were alleged to have occurred during the duration of the alleged conspiracy. We have no doubt that at the least the acts and transactions upon which all 41 counts were based were "connected together or constituting part of a common scheme or plan." Joinder of the offenses was authorized by the rule.

Rule 8(b) permits joinder of two or more defendants if they are alleged to have participated in the same series of acts or transactions constituting an offense or offenses. All defendants need not be charged in each count. We think the acts and transactions alleged in the first 38 counts, and in counts 39, 40, and 41 may be deemed one series of acts or transactions for the purpose of this rule.

■ Several appellants contend that they were prejudiced by joint trial and that the district court abused its discretion in denying motions for severance under Rule 14, F.R.Cr.P.

We do not find it so. It is true that the proof was voluminous (4,000 pages of transcript, covering four weeks of trial, and more than 1,000 exhibits, at least marked for identification). Several appellants were securities salesmen, while others occupied positions of greater responsibility and authority. Several appellants were active in sales of ASU stock during periods when other appellants were not. On the other hand, there was also considerable overlapping in time. The proof was orderly and as chronological as reasonably possible, and the court gave frequent cautionary instructions. As will be seen when sufficiency of the evidence is discussed, the jury was capable of discernment among counts and among defendants.

We consider the trial fundamentally fair.

During the investigation by the SEC various defendants had given testimony pursuant to administrative subpoenas. Transcripts were received by the court, but were not put before the jury except as excerpts were read. In each case the court instructed the jury that the excerpt was to be considered only against the defendant who made the statement.

■ Appellant Broderick contends that he was denied the right of confrontation and cross-examination [16] by such reading. He fails to specify the portions of statements of his codefendants which incriminated him. His name was apparently mentioned only in the portion read from appellant Olsen's SEC testimony. Olsen did not testify. These references established Mr. Broderick's presence at several conversations or occasions only generally described, and if they could be

---

10. Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

deemed incriminating in any sense, they were merely cumulative and the error, if any, harmless beyond a reasonable doubt.

These excerpts were not highly incriminating with respect to the person testifying except as they laid a foundation for an inference that the person knew the state of affairs was different from that which was represented to purchasers. In instructing the jury that these excerpts must be weighed with caution and the circumstances scrutinized to determine whether they were made voluntarily, the court referred to them several times as "statements" and once as "alleged admissions". Several appellants contend that the latter characterization was prejudicial. We do not find it so.

4. *Pretrial publicity and voir dire.* Certain appellants contend that prejudicial pretrial publicity required the court to dismiss the indictment or postpone the trial. There had been news stories concerning the indictment, about a year before trial. Two days before trial there had been two news stories. One referred to a "stock swindler" and concerned an unrelated indictment. Another reported the nolo contendere pleas of two of appellants' codefendants, and referred to the "gyroplane swindle". Appellants were not named.

The district judge conducted a careful and extensive voir dire. 64 prospective jurors were questioned. Although 40 said they had read or heard something in the media about the case, only two said they had formed opinions which would require evidence to overcome. They were excused. Most of the other 38 could not recall the extent of what they had read or heard and none had formed any opinion. Some recalled very recent news reports stating that the trial was to begin. There was nothing to indicate these had any prejudicial content. 9 of the 38 were selected for the jury. The answers indicated the content of the news stories had made little impression.

Denial of continuance was not an abuse of discretion, and we see no reason to believe the publicity affected the fairness of the trial.

The district judge questioned the prospective jurors, but invited defense counsel to request additional questions, which the judge then asked. Although objections to this method are urged by some of the appellants, it is authorized by Rule 24(a) F.R.Cr.P.[17]

5. *Claim of mistrial because of approach to juror.* Just before the beginning of the trial, Mr. Morrow, a juror who ultimately became foreman, reported an incident to the district judge. A Mr. Rank, a business associate of Morrow, who was president of a bank, had told Morrow of a call Rank received from appellant Vollmer after selection of the jury. According to Rank, Vollmer had once attempted unsuccessfully to arrange a mortgage for some property that Rank was interested in. Mr. Vollmer asked Rank if Rank thought that Morrow remembered Vollmer and if Morrow's decision as juror would be influenced in any way because Vollmer was unsuccessful in arranging for the mortgage. Morrow told the judge he did not remember Vollmer and had no recollection of the transaction. He said he had not told any other juror of the call and promised not to do so.

The court and counsel discussed the situation. Defense counsel moved for a mistrial, but the court decided to proceed.

Judge Dillin informed the jury substantially as follows: "One of the parties * * * contacted an acquaintance and asked him a question which required the acquaintance to ask a member of the jury for the answer, thus, of course, bringing to the attention of the juror the party who asked the question in the first place. The juror very properly related this to the Clerk, who related it to me, and I have now made it known to the attorneys. * * * I think, on thorough reflection, that nothing improper was intended, although, as I say, it was an irregularity on the part of the person who

---

17. See cases cited in Hamer v. United States (9th Cir., 1959), 259 F.2d 274, 279.

did it. * * * I am sure nothing out of the way will happen in the future, but if anything does, please report it promptly."

It is suggested that juror Morrow probably became prejudiced against Vollmer by Vollmer's call and that the other jurors probably became prejudiced against all appellants on trial as a result of being told that an unnamed party had indirectly contacted an unnamed juror. We think the incident is not of sufficient import reasonably to lead to those conclusions.

6. *Sufficiency of the evidence.* The first 38 counts rested upon separate sales and mailings. The mailings were made on dates from October 14, 1963 to June 1, 1965.

The first public offering of ASU stock began August 14, 1963 and was formally terminated June 1, 1964. The price was $4 per share.

The second public offering, at $6 per share began in June, 1964.

An offer at $5 per share was made to existing stockholders October 19, 1964.

The stock was split in December, 1964. Control of ASU changed from appellants Irving and Amick and their associates in January, 1965 to Chappell and his associates. In March, 1965 the SEC began its investigation and in July, 1965, it obtained an injunction against fraudulent sales.

Count 41 charged 23 individual and 6 corporate defendants, including appellants, with conspiring among themselves and with others named. The conspiracy allegedly continued from May 15, 1963 to the date of the indictment in 1966. Concededly many of the defendants did not participate in sales of ASU stock throughout the period, but it was the theory of the government that each was a member of the conspiracy during the period he was involved in the sales effort. The jury, however, acquitted of conspiracy all who stood trial.

We have already referred to the material incorporated in each of the 38 counts, alleging that from May 15, 1963 on, all appellants and others engaged in the conduct proscribed by 15 U.S.C. 77q(a), (1), (2), and (3) in the manner described in detail. Government counsel evidently considered, in drawing the indictment, that each defendant was responsibly associated in the fraudulent conduct throughout that defendants' participation in sales of stock. Again, however, the jury rejected reliance on any assumption of that nature and seems cautiously to have considered each count submitted, one by one.

a. *The case as to Amick.* Mr. Amick and Mr. K. K. Irving had held a dealership under Umbaugh. They were moving forces in the organization of ASU May 15, 1963 and the take-over from Umbaugh, under a plan of reorganization. Amick was secretary-treasurer of ASU and chairman of the board. He was active in management and in the planning and arrangement of the various offerings of stock. The jury could well have found that the successive offering prices and the stock split were a means of giving a false impression of increasing value. He must surely have known the material facts and responsibly have known of the misrepresentation and omissions in the sales material and the promotional news releases. He resigned as an officer in January, 1965, and as a director shortly thereafter.

Amick was charged in each of the first 38 counts. 26 of them were submitted to the jury. His active central role makes it seem likely that conviction on all counts, at least those which arose before his resignation, might have been sustained. The jury convicted, however, on 8 counts and acquitted on the rest. Chronologically, the dates of the mailings in 6 of the counts on which he was convicted ran from March 4, 1964 to September 1, 1964. The dates of mailing in the two other counts were October 14 and 21, 1964. Amick did not deal in person with these purchasers. But the jury could clearly find that the forbidden fraudulent practices were employed in these sales and that Amick was

wilfully responsible for their employment.

Amick was sentenced to four years imprisonment on count 6 (March 4, 1964) and two years on each other count. The two year terms are concurrent with each other, but consecutive to the four year term. The content of the fraud did not remain static. Disclosures concerning some of the adverse history of Umbaugh were omitted from the prospectus for the second offering, although included in the first. The expectation of benefits from an agreement with a Canadian group in August 1964 were grossly overstated. Deceptive photographs were sent to stockholders just before the October, 1964 offer in order to create the impression that regular production had begun. There were other additional misrepresentations from time to time. As previously stated, there are decisions holding that each mailing or each sale is a distinct offense, and it would logically follow that cumulative penalties could be imposed. Even under a different view, however, we think that the scheme to defraud involved in the various counts was sufficiently different as time went on, and that Amick was sufficiently active in formulating and augmenting the scheme that the use of the scheme in each of the respective counts could fairly be deemed a distinct offense with cumulative penalties, at least to the extent imposed here.

b. *The case as to Broderick*. Broderick was employed as a salesman for Van Horn Associates, dealer or underwriter for the first public offering. In June, 1964 he was employed by ASU as "stock control manager". He revised the prospectus, omitting material facts, and stating untruths with respect to patents and production, and used it in a number of sales.

Broderick was charged in the first 17 counts, the dates of mailing running from October 14, 1963 to September 29, 1964. 10 counts were submitted to the jury. He was convicted on count 17, and acquitted on the others.

Count 17 involved a sale of stock to Rufus S. Gray, and mailing the certificate to him.

Mr. Gray testified that about August 20, 1964, two men called at his office, McQuinn and Broderick. Both discussed ASU stock. He was given the prospectus which Broderick had revised. Gray was unable to say which man made particular statements, but one or the other represented that the company had over a million dollars in backlog orders, which was false, and that the price of the plane would be around $13,900, a matter which was still highly speculative, and that the plane could be flown with three or four hours instruction. The jury could well say that the scheme was employed in the sale.

Whatever the reason the jury acquitted Broderick of other counts, we think it could properly find him guilty on this count. The jury could properly find him responsible for statements even if made by McQuinn since they were made in Broderick's presence and in a joint effort to sell the stock. Broderick's position with ASU was sufficiently responsible to make him chargeable with knowledge of the facts. Wilfullness could be inferred.

c. *The case as to Vollmer and Indiana Investor*. Mr. Vollmer was editor of the Indiana Investor and Business News, published weekly by defendant corporation of similar name. Indiana Investor was devoted to "News of Indiana Business, Industry, and Securities". The record shows that it was frequently a channel by which misleading information concerning ASU stock reached investors and several purchasers testified that their interest in ASU stock had been generated by reading Indiana Investor. The government contends that almost from the beginning of the fraudulent promotion of ASU stock Vollmer frequently visited the company's facilities and was aware of facts in the light of which the news stories and some of his own editorial comments in Indiana Investor were false or misleading. There is evidence to support this contention.

Vollmer and the publishing corporation were charged in 36 of the first 38 counts, with mailing dates ranging from February 19, 1964 to June 1, 1965. 26 of these counts were submitted to the jury. It convicted Vollmer and the corporation on count 26, and acquitted them on all others. They were also charged and convicted on count 39, a violation of 15 U.S.C. § 77q(b).

Count 26 involved a purchaser named Janie Stech, and a mailing to her on January 21, 1965 of a confirmation for 1,000 shares at $6 per share. The sale was made by defendant Dowling, an employee of defendants Mayne and Securities Services, also convicted on that count.

Mrs. Stech testified that she had first become interested in ASU stock as a result of reading in Indiana Investor about the planned stock split. She had then bought 200 shares from Dowling in December, 1964. While considering the purchase of the 1,000 shares solicited by Dowling in January, she went to see Vollmer and asked him about Dowling and the plane. Vollmer spoke favorably of both, but told her he knew where she could get stock for $4 instead of $6. She considered herself committed to Dowling, however, and bought from him. Later another dealer telephoned her and offered stock for $4.

It must be acknowledged that Mr. Vollmer made no identifiable affirmative misrepresentation in the conversation about which Mrs. Stech testified. We think, however, that the evidence tending to show that he knowingly published false or misleading reports and editorial comment concerning ASU, was sufficient, in the light of the circumstances, to find him a wilful and knowing participant in the fraudulent course of conduct which generated the sales to Mrs. Stech, and, indeed, others.

At about the time of the Stech purchase of 1,000 shares, Vollmer persuaded Van Horn, the president of Commercial Capital, an interested dealer, to send a letter to all Commercial Capital and ASU stockholders recommending that they subscribe to Vollmer's paper. Vollmer prepared the letter, saying that Commercial Capital and ASU planned to use Indiana Investor to keep the Indiana investment community informed on the progress of ASU. The letter was mailed January 25. Very possibly the jury selected this particular count because of the personal appeal of Mrs. Stech to Vollmer for advice and the opportunity that gave him to give her information she needed and because of the proximity in time to the letter of January 25 and the events dealt with in count 39.

Count 39 charged Vollmer and Indiana Investor, and two others not on trial, with wilful violation of 15 U.S.C. § 77q (b). The gist of the charge was that they "by the use of the mails, published and * * * circulated * * * newspaper articles * * * which, though not purporting to offer a security for sale, described such security * * * for a consideration received, directly and indirectly, from an issuer, underwriter and dealer without fully disclosing the receipt of such consideration and the amount thereof". The Indiana Investor of January 29, 1965 was alleged to have been mailed on that date.

The January 29 issue reported acquisition of control of ASU by Robert Chappell's company, Investment Corporation of America (ICA) and an investment of "over $2 million", accomplished in major part by the purchase of a block of authorized, but unissued stock. This was itself untrue or, at least, misleading. But the point under count 39 was that Chappell and Vollmer had discussed the preparation and publication of the story, and at Vollmer's suggestion, Chappell had agreed to buy subscriptions for all stockholders of ICA. The testimony was that this would cost $1,000 or $1,200. On February 1, however, Chappell gave Vollmer an ICA check for $2,500. The January 29 issue of Indiana Investor did not disclose that consideration would be received.

We think the jury could properly find that Vollmer published the article in return for the promise of payment.

Vollmer and Indiana Investor contend that 15 U.S.C. § 77q(b), here found to have been violated, abridges freedom of the press, contrary to the first amendment.

The purpose of the statute is clear, and was stated in a committee report at the time of passage of the act as follows:

Section 17(b) "is particularly designed to meet the evils of the 'tipster sheet' as well as articles in newspaper or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." [18]

 The substantial interest of the investing public in knowing whether an apparently objective statement in the press concerning a security is motivated by promise of payment is obvious. We see no significant abridgement of freedom of the press in requiring disclosure of a promise of payment if there has been one.[19]

d. *The case as to Olsen.* Olsen entered the picture when employed by ASU as a stock salesman at the beginning of the second public offering (late June, 1964). In August, 1964, Van Horn, president of Commercial Capital Corporation (formerly Van Horn Associates) agreed to assist ASU and again began to sell stock to the public. Van Horn hired Olsen as a salesman for Commercial Capital, and Olsen later became sales manager.

Olsen was charged in counts 10 to 38, the mailing dates ranging from July 3, 1964 to June 1, 1965. 23 of these counts were submitted to the jury. It convicted Olsen on counts 18, 23, 24, and 25, acquitting him on the others.

Count 18 involved a purchase of 200 shares by Mr. Perkins in October, 1964 from Commercial Capital. Olsen and Wymer called on him. They told him ASU would be in production at an early date, had about a year's work ahead, and had about a year's parts inventory completed, in the shop and paid for.

Count 23 involved a purchase of 200 shares by Mr. Whitney in December, 1964. Olsen told him the plane would cost $13,500 and that ASU had quite a few back orders.

Count 25 involved a purchase of 1,000 shares by Mr. and Mrs. Rauer in December. The shares were bought from Commercial Capital and the salesman was appellant Wymer. The price per share was $8.75. Wymer told the Rauers the stock would be worth $12 per share by spring and that ASU had enough backlog of orders to last two years at continuous production. The July 9, 1964 prospectus was given the Rauers.

 The evidence establishes that at least by the time of these transactions, Olsen knew material adverse facts concerning the financial situation of the company and the lack of production, and should have known of the lack of firm orders for the plane. As sales manager of Commercial Capital he instructed its salesmen at sales meetings. We think that he could properly be convicted on counts 18 and 23 where he personally made false or misleading statements and failed to make necessary additional statements, and on Count 25 where the representations were not personally made by him, but by a salesman whom he instructed, and were consistent with the pattern of fraudulent conduct with which he was responsibly associated. Olsen had recommended Wymer to Van Horn for employment, saying Wymer was a good salesman "but also very fast in the field

18. Committee on Interstate and Foreign Commerce. H.R.Rep.No.85, 73d Cong., 1st Sess. (1933) 24.

19. See Communist Party of United States v. Subversive Activities Control Board (1961), 367 U.S. 1, 97–102, 81 S.Ct. 1357, 6 L.Ed.2d 625; Lewis Publishing Co. v. Morgan (1913), 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190; United States v. Harriss (1954), 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989; Burroughs v. United States (1934), 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484.

and should be watched with a very close eye".

Count 24 involved a purchase of 120 shares in December, 1964 from appellant Securities Services. Appellant Dowling was the salesman who dealt with the purchasers. We know of no evidence directly connecting Olsen with this transaction. We do not consider the evidence of his association with ASU or Commercial Capital in fraudulent conduct in the marketing of this stock to be sufficient proof of responsibility for the practices followed by Securities Services, although there is a brief reference to his having conducted one sales meeting for that company in the absence of appellant Mayne. We conclude that this conviction and sentence on this count must be set aside, although concurrent sentences remain in force.

e. *The case as to Wymer.* Wymer became a stock salesman for ASU in July, 1964, and was later employed by Commercial Capital.

Wymer was charged in counts 11 to 38, the mailing dates ranging from July 20, 1964 to June 1, 1965. 22 of these were submitted to the jury. He was convicted on counts 15, 18, and 25, and acquitted on the others.

Count 15 involved mailing by Commercial Capital to Mr. and Mrs. Riley on September 1, 1964 of a confirmation for 100 shares. Wymer had told Riley before he bought that ASU had thousands of orders and that production had just started. These statements were untrue and material, and of a type characteristic of the scheme.

Counts 18 and 25 have been described in d., above.

■ There is ample evidence that Wymer knew that the representations were untrue and intended that they persuade the prospective purchasers.

Wymer contends that the government failed to prove that the purchasers re-

lied on the untrue statements. It is true that they did not testify that they believed and relied on his assertions.

Courts have said that in prosecutions under 15 U.S.C. § 77q(a), at least where a fraudulent scheme was employed, it is unnecessary to prove that a victim parted with money or property in reliance upon misrepresentations.[20]

Considering the language of the three subdivisions of 77q(a), it is clear that the activity proscribed by subdivisions (1) and (3) need not be successful to be unlawful, and reliance by a victim need not be proved. (1) proscribes the *employment* of a device, scheme, or artifice to defraud. (3) proscribes *engaging* in a transaction, practice, or course of business which *would operate* as a fraud or deceit upon the purchaser as well as one which does. (2) deals specifically with untrue and misleading statements, but such statements are often elements or manifestations of a device, scheme, or artifice covered by (1) or of a transaction, practice or course of business covered by (3), so that when conduct unlawful under (1) or (3) has been proved it is not necessary to have proved conduct unlawful under (2). We conclude that proof of any degree of reliance was not required here.

It may be that the making of an untrue or misleading statement in the offer or sale of securities by the use of the mail or interstate telephone call might be so isolated from any other transaction that it would be unreasonable to deem it an element of a scheme or other conduct proscribed by (1) or (3). If so, the statement would not be unlawful under (2) unless it caused someone to part with his money or property. (2) declares it unlawful *to obtain* money or property *by means of* an untrue statement or material omission. Even in that instance, the victim's testimony that he relied would not be essential where causation

**20.** Farrell v. United States (9th Cir., 1963), 321 F.2d 409, 419, cert. den. 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478; Frank v. United States (10th Cir., 1955), 220 F.2d 559, 563; Bobbroff v. United States (9th Cir., 1953), 202 F.2d 389, 391.

could be inferred from all the circumstances.[21]

f. *The case as to Mayne.* David Mayne was president of Securities Services, Inc., a broker-dealer. In the fall of 1964 Van Horn discussed ASU stock with Mayne, and a while later, Commercial Capital, Van Horn's company, supplied Securities Services with blocks of shares for resale. Securities Services sold stock amounting to more than $382,000 and Mayne himself sold $54,000.

Mayne and Securities Services were charged in counts 22–38, the mailing dates ranging from December 15, 1964 to June 1, 1965. Twelve of these were submitted to the jury. Mayne and his company were convicted on counts 24, 26, 29, 30, 32, 33, and 34, and acquitted on the others.

Count 24 (already referred to under d.) involved a sale of 120 shares to Mr. and Mrs. Shaffer. The confirmation was mailed December 24, 1964. Mr. Shaffer dealt personally with Dowling, an employee of Securities Services. Dowling told him ASU had three years' back orders. This was untrue and material and a part of the scheme-pattern. Shaffer bought additional shares on later occasions. The jury acquitted Dowling on this count. It may well have given him the benefit of a doubt on the fact that he was relatively new and should not at that stage be held criminally accountable for the fraudulent scheme. An acquittal of Dowling on that basis is not inconsistent with conviction of his employer.

Count 26 (already referred to under c.) involved a sale of 1,000 shares to Mrs. Stech. Confirmation was mailed January 21, 1965. In November Mr. Mayne made an appointment with her over the telephone. Mr. Dowling kept the appointment. Mrs. Stech bought 200 shares in December. Dowling arranged to take her to the Auto Show in Indianapolis in January. The plane was on display there.

The display at the Auto Show was part of a stock sales promotion planned by several appellants. Stock salesmen were active there. Mayne prepared some of the sales literature for use at the Auto Show.

A summary sheet prepared by Mayne represented that the plane was FAA certified; that the selling price was $13,390; that the products of ASU were then being distributed through 150 dealers; that approximately 3,500 planes had been ordered with dealer down payments; that the backlog represented $47,000,000; and that $3,000 invested in ASU stock at various dates since September, 1963 was then worth $5,400. Each of these statements was untrue, or, at best, misleading unless qualified by additional statements which were omitted. This material was distributed at the show by Securities Services salesmen.

Mrs. Stech testified that Dowling pointed to a paper in the roof of the plane and said it was a certificate, and worth a million dollars. He told her the stock could not go down in price. He later told her he had 1,000 shares reserved for her, and that there was a firm in Canada that would take all they could get of it.

Count 29 involved a sale of 100 shares to Mr. and Mrs. Gilley. The certificate was mailed March 24, 1965. Mr. Gilley dealt personally with Mr. Von Foerster, a defendant not on trial, an employee of Securities Services. Mr. Von Foerster gave him a copy of the summary sheet prepared by Mayne and referred to under count 26, showed him an ASU stock sales booklet used by Mayne and other Securities Services salesmen, containing untrue and misleading statements of material facts, and orally made untrue or misleading statements concerning production plans and the price of the plane.

21. See cases cited, 35 C.J.S. False Pretenses § 52, including People v. Gordon (2d Dist., 1945), 71 Cal.App.2d 606, 163 P.2d 110, 124; State v. Hastings (1950), 77 N.D. 146, 41 N.W.2d 305; Corscot v. State (1922), 190 Wis. 661, 671, 178 N.W. 465.

Count 30 involved a sale of 100 shares to Mr. Sears, with confirmation mailed March 24, 1965. Sears also dealt with Von Foerster and received the same summary sheet and was shown the same sales booklet as Mr. Gilley.

Count 32 involved a sale of 50 shares to Mr. and Mrs. Lang, with confirmation mailed April 5, 1965. Mr. Lang also dealt with Von Foerster, was shown the same sales booklet as Gilley and Sears, and was told untrue information about current production, back orders, and the price of the plane.

Count 33 involved a sale of 300 shares of Securities Services to Mr. and Mrs. Whitaker. The sale and the mailing of the certificate April 13, 1965 were proved. We find no evidence disclosing the information given. Conviction of Mayne and Securities Services on this count could rest only upon an inference that a scheme to defraud frequently employed by them in the sale of a particular security was employed in every sale at about the same time. We consider this inference, under the circumstances of this case, too weak to constitute proof beyond a reasonable doubt, and conclude that conviction on this count must be set aside. The sentences on other counts, however, are concurrent.

Count 34 involved a sale of 50 shares by Securities Services to Mr. and Mrs. Wininger, with certificate mailed April 16, 1965. Mr. Wininger received the same summary sheet as Gilley and Sears.

Counts 24, 26, 29, 30, and 32 involved sales made by employees of Securities Services, of which Mayne was president. Mayne employed, instructed, and supervised these salesmen. He prepared and provided them with sales material containing untrue and misleading statements. There is, in our judgment, sufficient evidence upon which to find that he knew of the fraudulent character of the scheme which the salesman would employ [22] and intended that the prospec-

tive purchasers be persuaded to buy the stock. We conclude that the convictions of Mayne and Securities Services on these counts are adequately supported, and support the respective sentences.

*g. The case as to Dowling.* Dowling was a salesman for Securities Services in late 1964 and early 1965. He later became a salesman for Commercial Capital.

He was charged in counts 22 to 38, the mailing dates ranging from December 15, 1964 to June 1, 1965. Twelve of these were submitted to the jury. He was convicted on count 26 and acquitted on the others. The facts relevant to count 26 have been summarized above, in c. and f. We think the evidence supports the finding that he made the representations knowingly and wilfully.

*h. The case as to Riggs.* Mr. Riggs was manager of a life insurance agency. He became interested in ASU at the Auto Show and approached Olsen about selling stock. They made a deal whereby Riggs and his salesmen would receive $1.50 per share of stock which they sold for Commercial Capital. At the time the price of the stock was $6 and Riggs was to pay $4.50.

Riggs was charged in counts 27 to 38, with mailing dates from February 8 to June 1, 1965. Seven of these counts were submitted to the jury. Riggs was convicted on count 38 and acquitted on other counts.

Count 38 involved a sale of 137 shares to Dr. Briggs. The confirmation was mailed June 1.

 Dr. Briggs was a medical examiner for the life insurance company. He was first approached by James Dillon, one of Riggs' agents. Dillon said ASU stock was a good buy, and he showed pictures of the plane. Dr. Briggs telephoned Riggs to inquire about the stock. Riggs said it was scarce, was a good buy at $7 and would

---

22. Mayne was surely in a position where he is deemed to have known that which could have been learned by inquiry rea-

sonably to be expected. See cases cited infra, fn. 23.

go up to $10 in a short time. He said about fifteen planes per month were being produced. This was untrue, as well as the representation that the stock was scarce. Briggs bought at $7. A week later he decided to buy more and found he could buy 625 shares through a local bank at $5.62½. Riggs could give no satisfactory answer when told of this. At about the same time as his sale to Briggs, or shortly before, Riggs had been buying ASU stock from a disinterested dealer at about $4.50 per share and selling it to investors at about $6.60 per share. Riggs had visited the plant and was aware that certification of the plane had been held up. Although there is no direct evidence that he was informed of the truth as to lack of production, he admitted that he did not know how many planes were being produced because "I heard all kinds of figures". We think that the jury's finding of wilfulness in misrepresenting production can properly rest upon the proposition that he recklessly made the representation for the purpose of inducing a purchase when he must have had serious question what the facts were, but had failed to use reasonable means at hand to learn them.[23]

7. *Alleged bias of judge.* Appellants Vollmer and Indiana Investor suggest that the district judge ought to have recused himself, and that certain colloquies between the judge and their counsel deprecated counsel so as to diminish his effectiveness before the jury.

These appellants sought a change of venue, with an affidavit asserting that Judge Dillin had issued a preliminary injunction July 12, 1965 in a civil action brought by the SEC, alleging substan-tially the same facts as the indictment, and quoting Judge Dillin's oral findings adverse to these appellants. Judge Dillin found the application for change of venue insufficient and denied it.

Rulings and findings made by a judge in the course of a judicial proceeding are not in themselves sufficient reasons to believe that the judge has a personal bias or prejudice for or against a party.[24] The affidavit was insufficient to oust Judge Dillin under 28 U.S.C. § 144.

These appellants set forth nine short excerpts from the record. Most were critical of some aspect of trial procedure being employed by counsel and some directed him to cease. Most of the admonitions seem to us to have been merited and appropriate in substance. We are not persuaded that they communicated to the jury any view held by the judge on the merits of the case nor that they in any way deprived these appellants of a fair trial.

8. *Challenge to SEC subpoenas.* Certain corporate records of Indiana Investor were used against it and against Vollmer. The government had obtained these records by an SEC subpoena issued pursuant to 15 U.S.C. § 77s (b) and enforced by the district court, pursuant to § 77v(b). Appellants Vollmer and Indiana Investor claim that the judicial compulsion exercised was an unreasonable seizure under the Fourth Amendment. No claim is made that the records were other than corporate.

It may well be that any challenge now made became foreclosed by the adverse result of the judicial proceeding which resulted in enforcement of the subpoena. In any event, the subpoena was not the general subpoena dealt with in Hale v.

23. See United States v. Ross (2d Cir., 1963), 321 F.2d 61, 65, cert. den. 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123; Irwin v. United States (9th Cir., 1964), 338 F.2d 770, 774, cert. den. 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433; United States v. Schaefer (7th Cir., 1962), 299 F.2d 625, 629; United States v. Vasen (7th Cir., 1955), 222 F.2d 3, 8, cert. den. 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744.

24. Ex parte American Steel Barrel Co. and Seaman (1913), 230 U.S. 35, 43, 33 S.Ct. 1007, 57 L.Ed. 1379; Tucker v. Kerner (7th Cir., 1950), 186 F.2d 79, 84.

Henkel[25] upon which appellants rely. The answer to their claim is summarized in Oklahoma Press Pub. Co. v. Walling as follows:

> "[T]he Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."[26]

9. *Other claims of error upon trial.* We have examined other claims of error in rulings and instructions, but find no merit in any.

10. *Irving's claims.* Appellant K. K. Irving was president of ASU and active in its organization and management. He was charged in all counts except count 39. On June 1, 1967, just before the trial, and when accompanied by his counsel, he entered a plea of *nolo contendere* to 21 counts. After the trial, on July 28, 1967, at the same time others were sentenced, the court found him guilty on counts 10, 12, 14, 19, 20, and 21. He was sentenced to five years on count 10, and two years on each other count. The term on count 12 was consecutive to that on count 10, and all other terms were concurrent with that on count 12.

Mr. Irving raises challenges, as do other appellants, to the grand jury, the indictment, refusal of severance and denial of continuance on account of pretrial publicity. Apparently he considers that his plea does not foreclose the latter contentions on the theory that immediate joint trial subjected him to pressures which made his plea involuntary. As already set forth, we deem all these claims insufficient.

Mr. Irving also challenges the propriety of the sentences on several other grounds, which we now consider.

Irving claims that the court improperly considered the evidence heard at trial. Under the circumstances, where the plea was entered the morning the trial was to begin, and further consideration of the plea was postponed, it would seem very likely that the court would consider the evidence at trial to the extent it bore upon the charges to which Irving had pleaded *nolo contendere*. It is clear the court did consider the evidence at the criminal trial in determining that there was a prima facie showing that the offenses charged had been committed. Irving appears to claim, however, that a colloquy just after the plea was entered included an understanding that the court was limited to evidence it recalled from the earlier civil litigation and to Irving's own testimony in the SEC investigation. Although those sources were mentioned as appropriate for consideration by the court in making findings of guilt, we can find no limitation to them or exclusion of evidence at trial, express or implied. Indeed counsel for Irving said, in the course of the colloquy: " * * * my understanding was that * * * and I indicated to Mr. Stein [the United States attorney] that the evidence that the Court would hear in the pending case * * * it was my understanding with Mr. Stein that that could be used for the purposes that were indicated."

The second claim is that assertions made by the court at the hearing prior to the pronouncement of sentence showed that the court relied on erroneous information. The colloquy between the court and Mr. Irving after counsel had spoken

---

25. (1906), 201 U.S. 43, 77, 26 S.Ct. 370, 50 L.Ed. 652.

26. (1946), 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614; See Penfield Co. of Cal. v. Securities and Exch. Com'n (9th Cir., 1944), 143 F.2d 746.

amounts to fifteen pages of transcript. The court outlined several adverse factors: That Irving and others had committed a deliberate fraud on the reorganization court in Florida; that Irving had misrepresented in that court his ability and willingness to commit a million dollars worth of assets to ASU if necessary; had misrepresented that no public offering of stock was contemplated in the near future; and had joined in an improper agreement to give Mr. Umbaugh an interest in ASU.

Three of the allegedly erroneous accusations relate to the above matters. The differences between Irving and the court in these respects are matters of interpretation of and choice of inferences from facts which were thoroughly established.

The court also stated that although Irving claimed to have lost $200,000 in ASU, figures worked out at the court's request, apparently by the government, indicated he came out a little better than even.

Mr. Irving was given an opportunity to respond to all the court's assertions and he succeeded in convincing the court that the computations were in error and that he had suffered a loss exceeding $150,000. The error was acknowledged by the court before sentence was pronounced.

The third claim is that the seven year total sentence is substantially longer than those imposed in a number of reported cases. The government counters with citations of securities fraud cases where the terms were longer than seven years. Disparity in sentences is not a predicate for appellate review.

11. *McQuinn's claims.* Mr. McQuinn was a stock salesman employed by ASU in the summer of 1964. He was charged in counts 7 to 17, with mailing dates from April 8, 1964 to September 29, 1964. He entered a plea of *nolo contendere* to eleven counts and was found guilty on counts 16 and 17.

He raises only challenges which have already been disposed of.

12. *Nash's claims.* Mr. Nash was sales manager for ASU and had previously been employed by Umbaugh. He was charged in every count except count 39. On June 1, 1967 (at the same time as Irving) he pleaded *nolo contendere* to 21 counts. On July 28, the court found him guilty on counts 10, 14, 18, 19, 20, and 21, and sentenced him to concurrent terms, the longest being five years on count 10. Nash appeared without counsel on June 1 and July 28. In August, counsel filed a motion on his behalf to set aside the conviction and for leave to withdraw the plea. The court set aside the conviction and sentences, apparently because the record did not affirmatively indicate waiver of counsel on July 28, but denied leave to withdraw the plea. On October 26, the court found Nash guilty on counts 10, 14, 19, 20, and 21 and sentenced him to concurrent terms, the longest being four years on count 10. All other counts were dismissed or findings of acquittal made.

Mr. Nash makes contentions similar to some of those made by Mr. Irving and other appellants and already disposed of. In addition he contends in his brief on appeal that the district court "committed error in holding that [he] waived the right to counsel at the time he entered his plea of *nolo contendere*". He also asserts that when his conviction was set aside he gained the right to liberality in considering his request for leave to withdraw his plea. We do not find the latter argument very persuasive where the conviction was set aside, as here, on grounds arising after the plea. We observe, also, that Nash is not justly entitled, unless there be good reason, to put the government to a long and repetitious trial which would not have been necessary if Nash had maintained his plea of not guilty and stood trial as scheduled.

We conclude that there was a sufficient waiver of counsel at the time the plea was entered. The facts are, in substance, as follows:

Mr. Van Orman, who is Nash's counsel on this appeal, filed an appearance as counsel for Nash in the district court

July 22, 1966, and continued to represent him until April 14, 1967 when the court permitted Van Orman to withdraw. Van Orman had made motions on behalf of Nash and had appeared April 3 at a pretrial conference. The trial date of May 31 (later postponed one day) was then set. Nash appeared May 29 and requested a continuance in order to seek counsel. The continuance was denied. He appeared May 31 and June 1 without counsel.

On the morning of June 1, Nash, Irving, and Mr. Kightlinger, Irving's counsel, were before the court. Mr. Kightlinger stated that he had explained the plea about to be entered to his client and that since Nash was not represented, he had, upon request by Nash, "given him advice as to the effect of the plea which he desires to make". After asking and obtaining Nash's permission, Kightlinger said he was entering *nolo contendere* pleas for both. The court then carefully and precisely explained the meaning, effect and consequences of a *nolo contendere* plea. It has not been claimed, nor could it be, that there was any deficiency in compliance with Rule 11, F.R. Cr.P.

After full explanation, the court said: "Now, Mr. Nash is not represented by counsel this morning, but in the past he at one time had counsel. Counsel withdrew his appearance, stating at that time that Mr. Nash was financially able to hire counsel but had not completed his arrangements with counsel. Mr. Nash has never indicated to the Court that he is not financially able to hire counsel. He has appeared here as his own counsel on one or two occasions, the last being yesterday morning, so counsel has not been appointed for Mr. Nash. It has been my finding or opinion, as things have gone, that he has elected to represent himself. Is that right, Mr. Nash?" Mr. Nash replied, "Yes, Your Honor."

The court then inquired as to their pleas. Each pleaded *nolo contendere.* The court accepted the pleas, but stated he would make no finding until he heard something to prove the corpus delicti. The discussion concerning the source of proof, already referred to, followed.

There would be a serious problem if this were a typical arraignment and the court said no more about the availability and usefulness of counsel. But here we think the court could rely upon the earlier proceedings, and that Nash's reply, in these circumstances, was a sufficient waiver of counsel.

Our conclusion is strengthened by the fact that the motion, prepared and filed by Nash's counsel in August, neither claims any lack of understanding about the nature of the charge or the consequences of the plea nor that he did not intelligently waive counsel.

We think that Nash has failed to show that withdrawal of the plea is necessary to correct manifest injustice, and that there was no unfairness or abuse of discretion in denying such leave.

The convictions and sentences of appellant Olsen on count 24, and of appellants Mayne and Securities Services on count 33 are set aside. In all other respects the judgments appealed from are affirmed.

## ON PETITION FOR REHEARING

## PER CURIAM.

Appellant Nash correctly takes exception to the statement in the opinion that "It has not been claimed, nor could it be, that there was any deficiency in compliance with Rule 11, F.R.Cr.P." We gladly correct it. Nash did advance such claim on appeal and although the district court addressed Nash personally before accepting his plea of *nolo contendere,* and carefully explained the consequences of the plea, the district court omitted explanation of the nature of the charge. Under McCarthy v. United States, decided April 2, 1969, 394 U.S. 459, 89 S. Ct. 1166, 22 L.Ed.2d 418, such omission would require affording Nash an opportunity to plead anew. *McCarthy,* how-

ever, has been limited to prospective effect, and does not apply to Nash's plea, accepted June 1, 1967. Halliday v. United States (1969), 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16. The petition for rehearing is denied.