Michelle OLIVER et al.,
Plaintiffs-Appellees,

v.

**MICHIGAN STATE BOARD OF
EDUCATION et al., Defend-
ants-Appellants,**

and

**Kalamazoo Board of Education et al.,
Defendants-Appellants.**

Nos. 74–1104, 74–1105.

United States Court of Appeals,
Sixth Circuit.

Dec. 9, 1974.

Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Eugene Krasicky, George L. McCargar, Jr., Thomas F. Schimpf, Lansing, Mich., for State Board of Education.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Philip L. Hummer, Richard A. Enslen, Kalamazoo, Mich., James A. White, Foster, Lindemer, Swift & Collins, Lansing, Mich., for plaintiffs-appellees.

Arthur Staton, Jr., Ford, Kriekard, Staton & Allen, Kalamazoo, Mich., Michael H. Jackson, Denver, Colo., for Kalamazoo Board of Education.

Before WEICK, CELEBREZZE, and PECK, Circuit Judges.

CELEBREZZE, J., delivered the opinion of the Court, in which PECK, J., joined. WEICK, J., (pp. 187–197) filed a dissenting opinion.

CELEBREZZE, Circuit Judge.

These appeals present the merits of a school desegregation suit brought against the Kalamazoo Board of Education, its Members, and its Superintendent, and against the Michigan State Board of Education and its Superintendent.[1] The District Court's Order grants permanent injunctive relief in the form of a desegregation plan adopted by the Kalamazoo Board of Education on May 7, 1971, but revoked on July 6, 1971. The injunction requires the State and local defendants to refrain from further segregative actions and inactions. The District Court assessed the costs of the proceedings against Appellants, but left the question of attorney fees for subsequent resolution.

The State and local defendants filed appeals, which have been consolidated in this proceeding. The issues are essentially three: whether the District Judge should have recused himself, whether the District Court's standard of liability was incorrect, and whether the District Court's findings were clearly erroneous.

---

1. Prior orders in this case have included the following: Temporary Restraining Order (Aug. 12, 1971); Preliminary Injunction, 346 F.Supp. 766 (W.D.Mich.1971) (Aug. 24, 1971), aff'd, 448 F.2d 635 (6th Cir. 1971) (Aug. 30, 1971); Order Denying Motion to Recuse (Aug. 9, 1972); Order Denying Petition for Writ of Mandamus or Prohibition seeking Recusal of District Judge (6th Cir. Jan. 5, 1973); Opinion and Order of Permanent Injunction, 368 F.Supp. 143 (W.D.Mich.1973) (Oct. 4, 1973).

## Recusal

■ Appellants moved, pursuant to 28 U.S.C. § 144 (1968),[2] that the District Judge, Noel P. Fox, recuse himself because of his personal bias or prejudice in the case. The affidavit which accompanied the recusal motion contained numerous allegations about the propriety of certain rulings of the District Judge. Finding that the allegations failed to establish the personal bias or prejudice required to sustain a recusal motion, the District Court denied the motion.

Appellants' affidavit included allegations that the District Judge held "an unshakable conviction" that there is no distinction between de facto and de jure segregation for constitutional purposes; that the relief granted was biased in favor of the black plaintiffs and prejudicial to poor whites; that personal bias for the plaintiffs was demonstrated by the manner in which the parties were characterized and the treatment accorded the parties, counsel, and witnesses; that an irrelevant and erroneous finding was made with regard to certain advice given by the defendants' attorney; that a Motion for Protective Order filed by plaintiffs was given improper treatment; and that there was undue delay in holding the trial on the merits of the case. All these allegations relate to, and are sought to be supported by, proceedings in and rulings by the District Court.

Treating the facts alleged in the affidavit as true and looking only to the sufficiency of those facts in considering the recusal motion, Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), we find that the allegations do not suffice to support a claim of personal bias or prejudice on the part of the District Judge. As we have stated previously:

> The bias or prejudice which will disqualify a judge must be "personal" bias or prejudice as distinguished from a judicial one. . . .

> It is not sufficient if the alleged bias or prejudice arises out of the judge's background and associations rather than his appraisal of the complaining party personally. . . .

> Nor is it sufficient that the alleged bias or prejudice arises from the judge's view of the law, which may have been expressed by him in some prior case. . . .

> A judge is not disqualified merely because he believes in upholding the law, even though he says so with vehemence. . . .

> Adverse rulings during the course of the proceedings are not by themselves sufficient to establish bias and prejudice. Knapp v. Kinsey, 232 F.2d 458, 466 (6th Cir. 1956).

*See* United States v. Amick, 439 F.2d 351, 369 (7th Cir. 1971); Plaquemines Parish School Board v. United States, 415 F.2d 817, 824–825 (5th Cir. 1969); Tynan v. United States, 126 U.S.App. D.C. 206, 376 F.2d 761, 764–765 (1967). We affirm the District Court's denial of the recusal motion.

## Standard of Liability

Appellants challenge the standard of liability applied by the District Court, asserting that the District Court held them responsible for remedying de facto segregation and ignored the requirement that de jure segregation be shown as a predicate to a desegregation order.

■ We agree with Appellants that no remedy may be ordered when no consti-

---

**2.** 28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

tutional violation has occurred. The federal courts are not free to intrude on the legitimate prerogatives of elected school officials. But the federal courts are guardians of constitutional rights and will protect minorities and majorities alike when they are deprived of the equal protection of the laws, despite an inevitable intrusion into decisions left to public officials in the absence of a constitutional violation. Given a constitutional violation, a remedy is not only proper but necessary. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 90 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

We need not confront the question whether de facto segregation in a public school district establishes a constitutional violation of the Equal Protection Clause.[3] The District Court explicitly adopted a test dependent on purposeful segregation by public school officials:

> For the purposes of this case, the court assumes that the plaintiffs must establish that the defendants are guilty of de jure segregation of the Kalamazoo public schools.

. . . . .

[T]he major legal elements and conditioning factors of the constitutional tort of de jure segregation [footnote omitted] are reasonably clear. Under the Keyes theorem, in addition to showing that segregated schools exist, plaintiffs should establish (1) that the state to a significant degree caused or maintained these segregated conditions, and (2) that the state intentionally, i. e., purposefully, created or maintained them. . . .

Under Keyes, in an intentional case, to be guilty of a constitutional viola-

tion, the state and local authorities must have in fact caused or maintained the segregated conditions which are complained of. Under this theory, it is a complete defense that the state and local authorities have not at all caused or maintained these conditions. Similarly, the state will not be held legally responsible if it has only occasionally committed segregative acts and these acts are of trivial importance and bear no significant relation to the modern situation.

Rather, the standard must be that the state and local agencies to a substantial degree contributed to the creation or maintenance of segregated schooling in Kalamazoo. . . .

Under Keyes, defendants must not only have caused the schools to be segregated, but must have intentionally caused them to be segregated. . .

Of course, in order to make its ultimate determination on the issue of intention, the court must fully consider the evidence and arguments presented by all the parties, including the claim by the Kalamazoo school board that it was resolutely applying a racially neutral neighborhood school policy. . . .

It is established that where an appropriate factual showing has been made, including a showing that an existing segregated situation is to a significant extent the natural probable, and actual result of the actions and inactions of the state and local agencies, the plaintiffs have laid an evidentiary foundation for the conclusion that the results, segregated schools, were intended to be reached by these authorities. 368 F.Supp. 143, 157, 159, 161, 162.

We find this to be a correct formulation of the de jure test, flowing directly from our holdings in Bradley v. Milliken,

---

3. This is a question which the Supreme Court seems to have left open, Keyes v. School District No. 1, 413 U.S. 189, 212, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). At least one Circuit has abandoned the de factó-de jure distinction. Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 149 (5th Cir. 1972) (en banc), cert. denied, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044, rèh. denied, 414 U.S. 881, 94 S.Ct. 31, 38 L.Ed.2d 129 (1973).

484 F.2d 215, 222, 241–242 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (July 25, 1974), and Davis v. School District of Pontiac, 443 F.2d 573 (6th Cir. 1971), aff'g 309 F.Supp. 734, 744 (E.D. Mich.1970), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971), cited with approval in Keyes v. School District No. 1, 413 U.S. 189, 210, 93 S.Ct. 2686, 37 L.Ed.2d 1043 (1973). *See also* Brinkman v. Gilligan, 503 F.2d 684 (6th Cir. 1974); United States v. Board of School Commissioners, 474 F.2d 81 (7th Cir. 1973), aff'g 332 F.Supp. 655 (S.D.Ind.1971), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973). Although our conclusion regarding a cross-district remedy was reversed by the Supreme Court in Milliken v. Bradley, the Supreme Court unanimously affirmed our determination that de jure segregation had been proven within the City of Detroit, on the basis of the same standard used by the District Court in this case.[4]

■■ A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools.[5] A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies. Keyes v. School District No. 1, *supra*; Bradley v. Milliken, *supra*; Davis

v. School District of Pontiac, *supra*; Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973); Branche v. Board of Education, 204 F.Supp. 150 (E.D.N.Y.1962); People v. San Diego Unified School District, 19 Cal.App.3d 252, 96 Cal.Rptr. 658 (Ct.App.1971); Johnson v. San Francisco Unified School District, 339 F.Supp. 1315, 1318 (N.D.Cal. 1971), app. for stay denied, Guey Heung Lee v. Johnson, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19 (1971).[6]

## Findings of Fact

■ We turn to Appellants' objections to the District Court's factual findings. Our function on review is limited to ascertaining whether the District Court's application of its legal standard to the facts before it was clearly erroneous. Goss v. Board of Education of Knoxville, 482 F.2d 1044, 1047 (6th Cir. 1973), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974); Northcross v. Board of Education of Memphis, 489 F.2d 15, 17 (6th Cir. 1973), cert. denied, 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 1974). Appellants challenge many individual findings of the District Court, but the theme of the local Appellants is that the Kalamazoo Board of Education has always followed a neighborhood school policy and has never intentionally furthered segregation, and the basic argument of the State Appellants is that there is no evidence at all that they contributed to segregation in the Kalamazoo public schools.

When constitutional rights are involved, the issue is seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive

---

4. See Opinions of Burger, C. J., 418 U.S. at 738, 94 S.Ct. at 3124, n.18; Stewart, J., concurring, 418 U.S. at 753, 94 S.Ct. at 3131; White, J., dissenting, 418 U.S. 762, 94 S.Ct. at 3136; Marshall, J., dissenting, 418 U.S. at 781, 94 S.Ct. at 3145.

5. *See* Note, "Keyes v. School District No. 1: Unlocking the Northern Schoolhouse Door," 9

Harv.Civ.Rights—Civ.Lib.L.Rev. 124, 149 (1974).

6. The regimen of presumption of intent established by objective facts and affirmative defense to rebut the inference of improper intent follows the practice in employment discrimination cases. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974).

citizens of the equal protection of the laws. Rather, under the test for de jure segregation, the question is whether a purposeful pattern of segregation has manifested itself over time, despite the fact that individual official actions, considered alone, may not have been taken for segregative purposes and may not have been in themselves constitutionally invalid. Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). Benevolence of motive does not excuse segregative acts. As the Supreme Court stated in Wright v. Council of City of Emporia, 407 U.S. 451, 461, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972), "The 'dominant purpose' test finds no precedent in our decisions. . . . The existence of a permissible purpose cannot sustain an action that has an impermissible effect."

The findings of the District Court are explicit, detailed and extensive, and need not be repeated herein. See 368 F.Supp. 143 (W.D.Mich.1973). We shall consider the overall situation in the Kalamazoo schools and three specific areas of school policy in determining whether the District Court's conclusions are clearly erroneous.

By stipulation it is admitted that much of the Kalamazoo public school system is racially segregated. The District Court found that of 29 elementary schools, with a total Black student percentage enrollment of 16.1%, 92.3% of the Black elementary students attended 5 schools, no Black pupils attended 6, and 14 schools had fewer than five Black students. Of five junior high schools, with a total Black enrollment of 14.7%, the Black student population of two amounted to only 1.7% of each school's enrollment, while the Black enrollment at the other three amounted to 26.2%, 24.6%, and 13.9%, respectively. Of two senior high schools, the student body of one was 1.6% Black while the Black student enrollment at the other was 19.7% of the school's population. Thus, while some Kalamazoo schools reflect the racial mix in Kalamazoo generally, some schools are identifiably "White" and others are identifiably "Black."

Racial segregation in the Kalamazoo schools was found to be directly tied to educational inequality between the races. The District Court found, "Black students have fallen as many as four grades behind their White counterparts by the time they leave school. Furthermore, the Citizens' Committee on Integration . . . reported in 1969 that identifiably Black schools ranked at the bottom of the system in terms of academic achievement." 368 F.Supp. at 155. Upon a thorough review of the evidence, we cannot find fault with the conclusions that the Kalamazoo public schools are racially segregated and that students in identifiably Black schools suffer educationally and psychologically from the segregated conditions.

Appellants do not attack these conclusions as vigorously as they deny that they have intentionally furthered school segregation. We need not consider each particular attack on the District Court's findings to conclude that the finding of purposeful segregation by public action and inaction not only is not clearly erroneous but is fully supported by the record. This conclusion is apparent from a review of three areas of school policy.

First, the District Court found that the local Appellants had used attendance zone policies to further and perpetuate racial segregation. The District Court flatly rejected Appellants' argument that the Kalamazoo Board had administered a "neighborhood school policy" in a racially neutral fashion. "It is apparent that Kalamazoo elementary schools were not situated and boundaries were not drawn in a fashion which regularly placed students in the schools closest to their homes." 368 F.Supp. at 165. The Board made one elementary school more than twice as large as the smallest school, rather than disperse students attending the large school to schools closer to their homes. While attendance zones were often altered in overwhelmingly White areas of the city, the "rigidification of the boundaries of schools attend-

ed by the majority of Black students had the predictable and actual effect of cementing Black students into special areas and particular schools within those areas, and of preserving many other areas and schools for Whites." 368 F.Supp. at 166. Optional attendance zones were used to assure eventual racial segregation in areas of the city with changing residential patterns.

An example of purposeful segregation through attendance zone policies concerns Harding Elementary School, which was closed in 1960. Half of Harding's parent population which was 15.7% Black had their children reassigned to Edison School. The other half which was less than 2% Black had their children reassigned to an optional attendance zone. The Board then located a portable building at a nearby predominantly White school, despite available space at Edison, which had a substantial number of Black students. This combination of actions had the predictable and actual effect of eventually designating Edison as a "Black" school. As the District Court found, "The Kalamazoo Board was purposely confining Black elementary children in the south central portion of the city to Edison school." 368 F.Supp. at 167.

■ Such use of attendance zone policies provides the basis for a finding of de jure segregation. Bradley v. Milliken, 484 F.2d 215, 221–236 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (July 25, 1974); Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); United States v. Board of School Commissioners of Indianapolis, 474 F.2d 81, 85–86 (7th Cir.), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973). We find that the attendance zoning policy of the Kalamazoo Board did not follow a racially neutral "neighborhood school policy" but encouraged and perpetuated segregation in the public schools.

Second, the Kalamazoo Board's policies on school construction and siting perpetuated and increased racial segregation, according to the District Court. Northglade elementary school, for example, was "racially identifiable" as a Black school when it opened in 1959. 368 F.Supp. at 170. Opening the school with its attendance boundaries, in combination with other actions and inactions of the Board, resulted in the "foreseeable and actual effect" of "contain[ing] the future growth of [the] Black elementary [school] student population on the north side in . . . three schools," which by 1969 had become 53.8%, 87.2%, and 95.6% Black. The District Court found a policy of encouraging all-White schools in the northwestern part of the city by construction and school attendance policies. 368 F.Supp. at 170–171. Furthermore, the Board's involvement in the Arcadia project, a new housing development, amounted to substantial assistance in creating a virtually all-White community and elementary school. 368 F.Supp. at 173–174. In so doing, the Board did not merely establish a school in an area which had become racially segregated through the operation of purely private forces, but actually involved itself in creating a segregated community and a segregated school. In addition, the Board added "permanent and portable classrooms to White schools [in cases where] there was a significant amount of space available in racially identifiably Black schools [with] the obviously foreseeable and actual effect of perpetuating the segregated conditions which prevailed" from 1961 to 1970 and beyond. 368 F.Supp. at 173.

In these and other instances, which we find supported by evidence in the record, the Board's school construction and siting policies furthered and solidified Kalamazoo public school segregation. As the District Court stated, its findings "at least parallel and probably exceed the observation of the Sixth Circuit Court of Appeals, affirming the District Court's finding of state responsibility for school segregation in Pontiac, Michigan 'that school location and attendance boundary line decisions, for the past 15 years, more often than not tended to

perpetuate segregation.' Davis, 443 F.2d at 576." 368 F.Supp. at 172. *See also Bradley,* 484 F.2d at 236–238.

A third substantial factor in the creation and perpetuation of a dual school system in Kalamazoo was faculty staffing policy, which the Supreme Court has cited as "among the most important indicia of a segregated system." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971).[7] The District Court found "that the deliberate assignment of teachers on a racial basis exacerbated the detrimental effects of state-imposed segregation, and was itself a significant segregative act." 368 F.Supp. at 178. Of the Black elementary staff in the Kalamazoo public schools in 1970, 80% were concentrated in the four elementary schools which contained 80% of the Black elementary pupils (out of 29 elementary schools in the system). Similar patterns existed for junior high and high school levels, albeit with less dramatic intensity. The Board seems to admit the disproportionate assignment of Black staff to "Black" schools, but argues that the rationale for such assignment by race was educational—to provide Black students with suitable role models and to decrease the tensions between teacher and pupil in the classroom.

■ The propriety of assigning Black staff to primarily Black schools, in the absence of a dual school system, is not in question here, except as it relates to the question whether a dual school system existed because of official actions contributing to the creation and perpetuation of a segregated school system. The inevitable result of assigning 80% of the system's Black elementary staff to schools with predominantly Black student bodies was to increase the identifiability of those schools as "Black." Whatever the wisdom and legality of placing more Black staff in schools with greater Black student populations, considered by itself, the disproportionate staff assignment by race clearly supports the District Court's conclusion that school board policies and actions served to create and strengthen the racial identifiability of certain schools as "Black" and thereby to further and perpetuate a dual school system in Kalamazoo. *See Swann,* 402 U.S. at 18, 91 S.Ct. 1267; Kelly v. Guinn, 456 F.2d 100, 107 (9th Cir. 1972); Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir. 1971).

The District Court cited other factors of relevance to its overall finding, including the provision of inferior buildings to schools with a large Black population,[8] the conscious neglect of many opportunities for decreasing racial segregation in the system,[9] and the "paucity of Black administrators and teachers" in the system.[10]

Finally, the District Court cited the action which immediately precipitated this suit as the "most concrete uncontrovertible predicate for the grant of equitable relief which Plaintiffs seek"—the July 6, 1971 resolution which revoked the May 7, 1971 plan which the Board had adopted to desegregate the school system. This revocation,[11] in light of the

---

7. "[W]here it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . ., a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Swann,* 402 U.S. at 18, 91 S.Ct. at 1277. *See also* Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

8. One School Board member testified that "The results [of the School Board's boundary and construction policies] were that the old schools were left to the Blacks."

9. *See* 368 F.Supp. at 178–180.

10. *See* 368 F.Supp. at 180.

11. Though the Board argues that the May 7 plan was merely "postponed," it argues on appeal that the plan was hastily conceived and it has not presented to the District Court any alternatives which could desegregate the schools as well as the May 7 plan. The District Court found that the plan had been "carefully conceived and thoughtfully adopted." 368 F.Supp. at 194. Furthermore, the District Court found that the July 6 rescission "was intended to be and did serve as an outright revocation of not only the specific

prior cumulative constitutional violation by the school authorities, is further evidence of the Board's racially segregative purpose. As the District Court stated, "This action literally transformed an integrated system (albeit a very new one) into a racially segregated system." 368 F.Supp. at 199.

We need not consider the revocation of the May 7 desegregation plan on its own to conclude that it supports the District Court's overall conclusion that the Kalamazoo public schools are de jure racially segregated. *See* Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 1043 (1973); Brinkman v. Gilligan, 503 F.2d 684 (6th Cir. 1974).

■ We affirm the District Court's finding that the Kalamazoo Board of Education, its members and its superintendent have substantially contributed to the segregated conditions that make the Kalamazoo schools a dual system, effectively classifying students on the basis of race and denying Black children the equal protection of the laws.

A final consideration is the liability of the State Appellants for the de jure segregation of the Kalamazoo schools. The District Court found:

> In sum, the Superintendent had general supervisory authority over public education in Michigan between 1954, the date of the Brown decision, and the adoption of the new Constitution. The State Board of Education and the Superintendent as its chief executive officer have shared this constitutional power between 1963 and the present. During this entire period, the Superintendent and the Board were aware of racial segregation in Michigan public schools through complaints to this effect and then through their own statistical data. Still, the Superintendent and the State Board have persistently failed to act in a meaningful way to ameliorate the situation.

These facts compel the conclusion that the State of Michigan, through

May 7 plan but also the broader underlying policy of school desegregation at the elementary and junior high levels in Kalamazoo."

the State defendants in this case, has intentionally sanctioned the segregation of schools by local boards, and has made a substantial contribution to the creation and maintenance of segregated public schools in Kalamazoo and elsewhere. While the court notes that the Michigan Attorney General issued an opinion in 1970 that the State Board did not have the jurisdiction to hear appeals and review decisions of boards of education on attendance zones, the court finds that too many genuine opportunities for action have existed since Brown in 1954 for the segregation evidenced by the census statistics to be fully excused by pleas of racial neutrality and merely adventitious segregation.

The State Board's persistent failure to implement the Joint Policy Statement of 1966 has been effective notice to local school districts throughout Michigan of a policy of non-supervision in the area of desegregation. These school boards were able to conclude that they could take actions for perpetuating Black schools without the interposition of the State Board and the State Superintendent. This non-action exacerbated the segregated conditions in many school systems in the State of Michigan, diminished the likelihood of voluntary desegregation, and permitted or perhaps encouraged the kind of counterproductive action exhibited in Kalamazoo on July 6, 1971, 368 F.Supp. at 190.

Upon a thorough review of the briefs and record, we find the District Court's conclusion as to the State Appellants to be supported by substantial evidence in the record.

■ The substantial control of Michigan state officials over local schools operations has been stated previously by this Court and need not be repeated herein. *See* Bradley v. Milliken, 484 F.2d 215, 238–241 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069

368 F.Supp. at 196. We find no error in these conclusions.

(July 25, 1974). Given de jure segregation in the Kalamazoo schools, substantially contributed to by local school officials, the State Board of Education and Superintendent may properly be held jointly responsible for segregated conditions in the Kalamazoo schools, in view of their consistent inaction in preventing increased segregation or remedying existing segregation in the Kalamazoo schools and their consistent funding of school construction projects, support for operating fund requests, and other assistance provided to Kalamazoo officials. The failure to take the many available measures against Kalamazoo officials for their segregative actions renders the State Board and Superintendent responsible for de jure segregation in the Kalamazoo schools and subjects them to the reasonable commands of the District Court's desegregation order. *See* United States v. State of Texas (Texas Education Agency), 321 F.Supp. 1043 (E.D.Tex. 1970), 330 F.Supp. 235, aff'd with mod., 447 F.2d 441 (5th Cir.), stay denied, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (Black, J.), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1971).

Finding no reversible error in the proceedings below or in the order issued therefrom, we affirm the decision of the District Court.

WEICK, Circuit Judge (dissenting).

The plaintiffs in their brief state, "This is a classic school desegregation case." The state appellants term it "unique." What happened is unprecedented in school desegregation litigation. The District Judge, by means of a temporary, and then a preliminary mandatory injunction (granted only eight days after the filing of a complaint), adopted and put into full force and effect a Racial Balance Plan for the public school system in Kalamazoo, Michigan.[1]

Thus, by means of the preliminary mandatory injunction, the plaintiffs obtained, without trial on the merits, all the relief which they were seeking. Of course, it was not final, but the Board was required to comply immediately with the injunction which involved substantial changes in operation, including the forced busing of school children away from their neighborhood schools to achieve a balancing of the races. Appellants contend that more busing is required than was necessary even to achieve a racial balance.

---

1. The Racial Balance Plan had been previously adopted at a meeting of the Kalamazoo Board of Education, held on May 7, 1971, in a resolution passed by a 4 to 3 vote. The plan was never implemented by the Board. The terms of office of two of the four Board members who voted in favor of the resolution were expiring at the end of the month and an election was imminent, to be held in June. At the June election two new members of the board were elected.

On July 6, 1971, at the first meeting of the new Board following the election, the Board by a 5 to 2 vote adopted a resolution which in effect rescinded the May 7th plan by postponing implementation of it for one year pending further study. The resolution called upon the school administration to submit alternate plans to improve racial and socio-economic balance. The resolution "provided in the interim for a voluntary transfer and transportation plan permitting students to transfer from neighborhood schools [to other schools] where better racial and socio-economic balance was attained."

Thus, at the time of the filing of the present suit no plan was either adopted or was in effect.

It seems to be more than a mere coincidence that substantially the same phenomena of a plan of desegregation adopted by the votes of Board members whose terms of office were about to expire, (and which plan was rescinded by the new Board) recently occurred in Dayton, Ohio (see Brinkman v. Gilligan, 503 F.2d 684 (6th Cir. Nos. 73–1974, 73–1975, decided Aug. 20, 1974)), and also in Cincinnati, Ohio.

The important questions in school desegregation cases ought not to be resolved by hasty and precipitous action taken on the eve of an election which could result in a change in the composition of the Board. The public is entitled to better treatment than that.

In the present case the plaintiffs sought to invalidate the Board resolution of July 6th, and to reinstate the resolution of May 7th. This relief was obtained in only eight days.

The law of Brown v. Board of Educ. of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), had been in effect for seventeen years before plaintiffs filed this action to vindicate their constitutional rights.

It would appear that the District Judge proceeded with great haste in hearing and granting the motion for a preliminary mandatory injunction, and proceeded with inordinate delay thereafter, as it took him more than two years before he finally heard and decided the case on its merits, without making any substantial change in the preliminary order.[2]

A preliminary mandatory injunction is seldom granted before final hearing on the merits, and should be granted only in extreme or exceptional cases. 42 Am. Jur.2d § 21, p. 753. The very purpose of either a temporary or a permanent injunction is to preserve the status of a case until final hearing. 42 Am.Jur.2d § 13, p. 740. The status here was that no plan for racial balance or desegregation was adopted nor was one in effect at the time the present action was filed. The District Court should not have put into effect any desegregation plan without a full hearing on the merits of the case.

It is not understandable why there was such a great rush to proceed with the hearing on the motion for a preliminary mandatory injunction. The case had just been filed. No black student had been excluded from a Michigan public school since 1869, which was more than one hundred years before Brown v. Board of Educ., supra, was decided by the Supreme Court. Workman v. Board of Educ., 18 Mich. 400. See also Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112,

41 L.Ed.2d 1069 (July 25, 1974) for history of Michigan schools. By 1945 black families lived in nearly all parts of the city of Kalamazoo, although there were greater concentrations in certain areas of the city. In that year black children attended every one of the fourteen schools in the system.

Black migration to Kalamazoo increased between the years 1940 and 1970 from 1,117 (2.06% of the population) to 7,974 (16.1%), all living within the 1940 boundaries. In 1970, 2,800 black children, or 16.2% out of a total enrollment of 17,285, attended the schools in Kalamazoo. They constituted 17.6% of the elementary school enrollment, 14.9% of the junior high enrollment, and 13.8% of the senior high school enrollment. Only three elementary schools in the entire system had a majority black enrollment.

In 1970 black children were enrolled in 33 of the 39 school buildings operated by the Board. From 1945 to 1970 only three elementary schools did not have a black student enrolled. During the period of migration the black families moved into areas of concentration already governed by preexisting attendance zone lines. There was no proof of gerrymandering of the previously-established lines.

It is obvious that the issues of this important case should not have been summarily resolved in eight days, as shown by the fact that the trial on the merits, which did not commence until a year and one-half later, consumed six weeks, with some two thousand exhibits, discovery depositions, and stipulations, most of which are contained in sixteen volumes of appendices filed in this Court. The Judge's opinion on the merits is over one hundred pages in length.

---

**2.** This Court affirmed by per curiam in Oliver v. School Dist., 448 F.2d 635 (6th Cir. 1971), holding that the District Judge did not abuse his discretion, but stating that it "expressly refrains from approving all of the language and holdings of the District Judge in his opinion rendered August 24, 1971."

The Court took into account the fact that the District Court "has scheduled an early plenary hearing on the merits of the case," at which time the Court could make modifications in the plan. The "early hearing on the merits" never took place.

The trial did not commence until February 28, 1973, and with recesses ended on May 21, 1973. The Judge filed his opinion and order on October 4, 1973 and a modification on October 18th, and issued a permanent injunction on November 2, 1973. The case had been pending since August 12, 1971.

In that opinion he adopted a multitude of findings of fact on contested issues.

On August 2, 1972 the Board filed an affidavit of bias under the provisions of 28 U.S.C. § 144, charging that the District Judge has a personal bias and prejudice against the Board and in favor of the plaintiffs and the class which they represent. The affidavit was supported by a certificate of good faith signed by counsel. In general, it charged the Judge with prejudging the major issues in the case; with difference in attitude and treatment of counsel and witnesses with each party's cause; with unjustly and improperly accusing counsel for the Board of unethical conduct in their representation of the Board; and with entering a protective order preventing counsel for the Board from deposing a former Board member and a present Board member; and with unduly delaying proceedings and the trial. The facts are related in sixty-three pages of the appendix. The District Judge held that the affidavit was insufficient, and he declined to recuse himself.

In considering the affidavit of bias and prejudice the facts as stated therein must be accepted as being true. The Judge has no right to resolve any statement of fact with which he may not agree. The fundamental principle is that all litigants are entitled to a fair trial before a fair and impartial Judge. In Knapp v. Kinsey, 232 F.2d 458, 465 (6th Cir. 1956), we reversed the judgment because of bias and prejudice on the part of the trial judge and a prejudgment by him of important issues before trial.

Here, the affidavit states that the Board, on August 21, 1972, filed a motion to dissolve the preliminary injunction. On December 21, 1972 the Judge by order deferred consideration of the motion to dissolve until final judgment. No mention of the motion to dissolve was made either in the Court's final opinion announced on October 4, 1973, or in its final judgment or order entered on November 2, 1973.

In his opinion granting the preliminary mandatory injunction the District Judge, in referring to the May 7th plan stated:

This court finds, as a matter of fact and law, that it [the May 7 plan] was not precipitous; that it was a very careful, deliberate, fully-considered plan by conscientious, sincere, publicly dedicated, self-sacrificing men who had the courage to "bite the bullet." (Ia34)

The reference to the men having the courage to "bite the bullet" was a gratuitous statement upon which no evidence had been taken. The character qualities of the board members were not an issue in the case. The statement was particularly inappropriate because the Judge made no mention of the character qualities of the Board members who opposed the May 7th resolution, and it could be inferred that the Judge was not willing to attribute to them the same qualities. He did, however, pay his respects to the new membership of the Board, stating that they were "reflecting outspoken community hostility to the integration plan" in adopting the July 6th resolution. It is obvious that the Judge thought that the new Board members did not possess the same good character qualities such as the old Board members possessed, who voted in favor of the May 7th plan.

The affidavit further states that the District Judge in his opinion on plaintiffs' motion for preliminary injunction stated that the Board's attorney, Arthur Staton, Jr., a member of the Ford law firm, had given incorrect legal advice to the Board in response to its question whether it would be proper to seek guarantees from a builder of a housing project that it would not enhance or add to racial segregation. The affidavit states that the school Board never requested such advice from its attorney; and that he never gave any such opinion.

The opinion which the attorney gave to the Board was in response to a request made by the Michigan Civil Rights Commission to the Board for a firm guarantee that the Board develop and

implement a plan for pupil assignment which would prevent any further racial imbalance in the schools regardless of the racial composition of the tenant population in the housing development planned for the city at Woodward Avenue and Paterson.

In response to the Board's request for an opinion on this subject, the attorney advised the Board:

It is my opinion that the Board of Education is not legally required to give the guarantee requested by the Commission.

It is obvious that the Court's criticism of the attorney for giving incorrect legal advice to the Board, was unjustified.

The conduct of the Judge most bitterly complained of in the affidavit of bias and prejudice, was his charge of unethical conduct on the part of the Board's attorneys who had represented the Board for twenty years, including the time when the May 7th and the July 6th resolutions were passed. The facts are detailed on thirty-three pages of the appendix, Ia159–192.

The matter arose when counsel for the Board gave notice to take discovery depositions of Board member Edward P. Thompson and former Board member Dr. Andrew C. Luff. Mr. Thompson had been a Board member since 1965 and a two-term president of the Board. Dr. Luff had been a Board member from 1968 to July 1, 1972, and was a past vice president and treasurer of the Board.

Both of these gentlemen supported the May 7th resolution and Thompson opposed the July 6th resolution. Thompson, in a statement to the news media, stated that it reflected "decades of compulsory segregation in this city." Luff had testified as a witness for the plaintiff in the hearing on the motion for a preliminary injunction.

The plaintiffs filed a motion for a protective order to prevent the taking of the deposition or to limit it to matters of public record, and to direct but not cross-examination.

The affidavit of bias states that at the first hearing on the motion after plaintiffs' counsel had concluded his statement, and without giving the Board's counsel even an opportunity to respond, the Judge proceeded to decide the motion.

A portion of the colloquy which took place between the Judge and the Board's counsel, is as follows:

THE COURT: This is what kind of bothers me, how your firm can continue to represent the school board when the school board drafted and participated in the activities for preparing the plan that is now in question, and now you are representing the school board that is questioning the plan that was worked out when your firm was their lawyer.

MR. STATON: Well, why can't we do that? Isn't a lawyer entitled to represent this board? We represented this board as changes have taken place down through the years. I know of no reason why that would foreclose this law firm from the representation of this client in whatever kind of cause they need representation.

THE COURT: Well, I presume that as a lawyer or the lawyers of your firm participated in drafting the plan that is now a part of the school board system, that you advised them on this plan. (Ia163–164)

.    .    .    .    .

THE COURT: I can't conceive how you can be in this position.

MR. STATON: What position is that, your Honor?

THE COURT: Well, you are representing two sides of the same question, and it is involving the same board.

.    .    .    .    .

MR. STATON: The two that we propose to depose are presently members of the Board of Education.

.    .    .    .    .

MR. STATON: Well, we have the right to depose even if they were my clients. I have a right to depose them under the rules of discovery, and the rules are clear on that, and I can produce the authority on that.

THE COURT: But you can't cross-examine. And I should probably preside at the deposition. (Ia167)

THE COURT: And your only client can operate through its members only, and that constitutes the Board. The Board doesn't exist in a vacuum. It exists with Board members, and that is the entity of your client.

.    .    .    .    .

THE COURT: Well, it is raised from this standpoint: How can you then challenge these people who you represented as the Board? They were the Board at that time. And this goes to the proposition of how far you can go with discovery, how far you can treat these persons as adverse. What you are trying to do is treat these parties as adverse.

MR. STATON: I am trying to treat them as witnesses, and if their position is hostile, I am asking no more than something the rules give to every lawyer, and that is the right to use such every technique that is necessary to determine the facts and the truth. The paramount issue in this lawsuit is the truth. The parties are certainly entitled to have this determined on the truth, and I don't think the annoyance of the witness—

THE COURT: I am not talking about the annoyance of witnesses. I am talking about a lawyer representing a client and having represented a client and advised the client on the very subject that is in issue in the case, the plan itself.

.    .    .    .    .

THE COURT: Well, what you are doing, you are deposing your own clients, and you are discovering your own clients' previous action, which you

participated in as a law firm. (Ia168–169)

.    .    .    .    .

THE COURT: Dual representation on the same issue. You advised these other people—at the time your law firm advised these other people during the preparation of the plan. Now, your law firm is representing a group that wants to tear the plan apart.

.    .    .    .    .

THE COURT: I am ruling that you search the law and show me your authority to do this in light of the position of your law firm, in the posture of the case, that is precisely what I am asking you to do.

MR. STATON: Well, now it is their motion, and I would think, in accordance with ordinary propriety—

THE COURT: I am asking you for this standpoint; You are seeking to have this man—these people discovered. Now, in the posture of your law firm as having advised the previous Board, now seeking to discover your own presently composed board members, you are examining your own clients. (Ia170–171)

All essential material relating to this subject was submitted to the Michigan State Bar Committee on Professional Ethics, and it rendered an informal opinion finding no ethical limitation on the right of the Ford law firm to take the depositions of Dr. Luff and Mr. Thompson, and to continue to represent the Board of Education. A copy of that opinion is attached to the affidavit of bias.

But all of this did not end the inquiry. The Judge held another hearing. The affidavit states that counsel for plaintiffs made their argument to the Judge, with but a single interruption from him, and then only to reassure counsel.

The Judge continued to insist that the Board's counsel represented also the individual members of the Board; that it was a "delicate" situation for the Board;

**192**

and that there was a "considerable conflict of positions." (Ia177).

At the conclusion of the hearing the Court ruled orally from the bench that the motion for a protective order was well founded, and he prohibited the Board's attorneys from taking the discovery depositions. In his oral opinion the Court stated:

> Counsel for the Board has urged that they have never represented the individuals, and they continue to urge that they do not represent the individuals; just the entity of the Board.
>
> While this may be mechanically true and a mechanical interpretation of the law, the fact remains that the Board of Education cannot and does not exist in a vacuum. It can only exist through its living human being members acting in their official capacities, and in no other way. It just doesn't exist in thin air.
>
> An attorney representing a school board should owe a duty of confidentiality to persons who are the only available conduit of information between the client corporate body entity and the attorney.
>
> The long recognized fundamental principle of confidential attorney-client communications and relations can have no meaning absent recognition of the role of human interaction. The concept of an insensible artificial entity as the sole client, while useful and appropriate for many purposes, dehumanizes the attorney-client relationship and emasculates the attorney and client privilege if applied in this area blindly without flexibility. (Ia181)

On January 19, 1973 the Court amended its protective order to permit the Board to take the depositions with counsel of its choice. The order, however, had a condition that the deposition could be taken only when the Court was available, and the Judge stated that the Court would not be available until one week before trial. The Board then retained other counsel to take the depositions.

The Court's refusal to permit counsel of choice to appear either in a civil or in a criminal proceeding constitutes a denial of due process. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Roberts v. Anderson, 66 F.2d 874 (10th Cir. 1933).

The affidavit charged further that it was the Judge who first initiated into the case the ethical question on the basis of presumptions which he made concerning the nature of the attorney-client relationship prior to the present litigation, which presumptions were without basis in fact and were derived from a personal bias and prejudice.

The affidavit further charged:

> *Three*—That your affiant states on information and belief the Honorable Noel P. Fox knew the mere raising of the Ethical question would stigmatize the Ford firm with unprofessional conduct before an entire community, and in litigation of great consequence and notoriety; that he knew such charge would deprive the Kalamazoo Board of Education not only of its choice of counsel but of counsel, because of background and experience, best able to represent it, with consequent additional delay and expense; that he knew such charge would require for refutation delay in the progress of the case until the ethical question had been of necessity resolved and its resolution would require the Kalamazoo Board of Education to disclose for all purposes of the litigation all attorney-client privileged information it had in connection with any matter related to the May 7th plan, its development and preparation, its passage, and the course planned by the Ford firm in the present litigation. It is this affiant's belief the Honorable Noel P. Fox could not, based solely on the aforesaid presumptions now clearly established as false, place the Kalamazoo Board of Education and its attorneys in such a position without such deep personal bias and prejudice against them as to render fair trial for them under him an impossibility. (Ia185–186)

The affidavit further charged that it was the plaintiffs who were seeking the protective order, not for their own protection, but to benefit material and crucial witnesses whom the defendant had the right to depose; and that the only benefit which plaintiffs could obtain from the protective order was concealment of the truth.

The applicable Canon of Professional Ethics is EC 5–18, which provides as follows:

EC 5–18 A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

Kalamazoo School District is an autonomous political body corporate, operating through a Board of Education popularly elected. M.S.A. § 15.3352; M.C.L.A. § 340.352; Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) fn. 20. It is a "similar entity" to a private corporation within the meaning of Canon EC 5–18, above set forth. The body corporate is a separate entity from the individual members who comprise the Board of Education.

According to Canon 5–18 the Ford law firm owed its allegiance only to the entity and not to the individual members of the Board of Education, whom they did not represent. The District Judge was continually advised that the Ford firm did not represent the individual members of the board, but the Judge did not accept that advice. There is not one iota of proof that the Ford firm represented the individual Board members; yet the District Judge kept insisting that they did represent them, that there was a conflict of interest, and that the law firm was unethical. In disqualifying the law firm from taking the depositions of Messrs. Luff and Thompson he did so, not on the basis of harassment, but solely on the basis of conflict of interest.

A lawyer's good reputation in a community is his stock in trade. To be accused of unethical conduct by a federal judge, in a highly publicized, emotionally-charged lawsuit, was certainly damaging to the reputation of the firm's lawyers in the community where they practiced law, and also with their client, the Board of Education, which they had represented for twenty years. The client could very well question whether it had effective representation before a Judge who entertained such views as to its lawyers. The question of ethics was not raised by the attorneys for plaintiffs, but was injected into the case by the Judge.

The affidavit states that the Judge indulged in a presumption that the Ford firm represented the individual members. In the colloquy the Judge stated more than once that the Board does not exist in a vacuum. The same situation would exist with respect to attorneys for a private corporation; it does not exist in a vacuum, and yet we know of no authority holding that the attorneys for a corporation represent also its officers and directors and owe them a duty of fidelity.

The Judge seemed to be bothered by the fact that the Ford law firm represented the Board at the time of the adoption of the May 7th plan and defended the Board in a state court action involving that plan. But that plan was adopted by the Board and not by the attorneys. In their twenty years of representation of the Board they no doubt witnessed many changes in the personnel of the Board.

Furthermore, it is not unusual for an attorney to defend a client who has inconsistent claims or defenses. The

pleading of inconsistent claims and defenses is expressly authorized by Rule 8(e)(2) of Fed.R.Civ.P. City of Kingsport, Tenn. v. Steel and Roof Structure, Inc., 500 F.2d 617 (6th Cir. decided August 5, 1974).

The motion for a protective order was really much ado about nothing.

Who were the plaintiffs seeking to protect, and from what? The fact is that they were seeking to protect two of their own witnesses who were elected public officials and who were parties defendant in the case. These officials had supported the May 7th resolution adopting the "Racial Balance Plan", and they opposed the July 6th resolution; they were important witnesses and their testimony was crucial.

The Board had the right to depose these witnesses in discovery depositions. This right was never disputed, not even by the Judge.

All that the protective order accomplished was to prevent the Board's general counsel (who was familiar with all the facts, and was very familiar with the conduct of these two witnesses) from deposing them. The protective order thus thwarted the Board in its efforts to discover the truth prior to the trial. It impinged on the Board's constitutional right to be represented in the case by counsel of its choice.

In his opinion denying the motion to recuse, the District Judge stated:

It is only if a judge draws upon nonjudicial sources to formulate a personal bias for or against any litigant which will affect his resolution of the merits of the issues before him that disqualifying prejudice is established.

In our opinion a Judge should not formulate a personal bias against a litigant from any source.

In Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), the Court said:

We are of opinion, therefore, that an affidavit upon information and belief satisfies the section and that upon its filing, if it show the objectionable inclination or disposition of the judge, which we have said is an essential condition, it is his duty to "proceed no further" in the case. (Id. at 35, 41 S.Ct. at 233)

The Court further said:

At any rate we can only deal with the act as it is expressed and enforce it according to its expressions. Nor is it our function to approve or disapprove it; but we may say, that its solicitude is that the tribunals of the country shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial, free, to use the words of the section, from any "bias or prejudice" that might disturb the normal course of impartial judgment. And to accomplish this end the section withdraws from the presiding judge a decision upon the truth of the matters alleged. Its explicit declaration is that, upon the making and filing of the affidavit, the judge against whom it is directed "shall proceed no further therein, but another judge shall be designated in the manner prescribed in the section last preceding, or chosen in the manner prescribed in section twenty-three, to hear such matter." And the reason is easy to divine. To commit to the judge a decision upon the truth of the facts gives chance for the evil against which the section is directed. The remedy by appeal is inadequate. It comes after the trial and, if prejudice exist, it has worked its evil and a judgment of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or decision than a disposition of a mind in which there is a personal ingredient. (Id. at 35–36, 41 S.Ct. at 234)

In Connelly v. United States, 191 F.2d 692 at 697 (9th Cir. 1951), the Court stated:

It is not enough that the judge, despite his predetermination of essential facts, may put them aside and conduct a fair trial but that there also shall be such an atmosphere about the proceed-

ing that the public will have the "assurance" of fairness and impartiality.

The atmosphere about the proceeding, if the affidavit is true, gave no assurance of fairness and impartiality to the public.

In discussing the fundamental rights of a defendant to a fair trial before a fair tribunal, we stated in Knapp v. Kinsey, 232 F.2d 458, at 465 (6th Cir. 1956):

> One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of actual bias or prejudice in the trial of the case. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942; Talbert v. Muskegon Construction Co., 305 Mich. 345, 348, 9 N.W.2d 572. If this basic principle is violated, the judgment must be reversed. In re Murchison, supra; Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; Moskun v. United States, 6 Cir., 143 F.2d 129, 130; N. L. R. B. v. Phelps, 5 Cir., 136 F.2d 562.
>
> Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts or statements on his part. Or it may appear during the trial by reason of the actions of the judge in the conduct of the trial. If it is known to exist before the trial it furnishes the basis for disqualification of the judge to conduct the trial. Section 144, Title 28, U.S.Code.

.        .        .        .        .

> This statutory provision is not directly applicable to proceedings wherein the claimed bias or prejudice appears during the course of the trial. However, there would seem to be close analogy between bias and prejudice which would disqualify a judge from sitting in a judicial proceeding and the bias or prejudice appearing during the course of the proceedings which would render the judgment therein invalid.

See also Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954); and Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

The importance of according to the Board its fundamental rights is made all the more clear by the fact that the District Judge adopted a multitude of contested findings of fact.

The majority has accorded to these many findings of fact all of the presumptions of regularity and has found them not to be clearly erroneous. But, if the Judge who made them was biased, as the affidavit of bias clearly states, then the Board has not been accorded its constitutional right to a fair trial. Berger v. United States, supra, 255 U.S. at 35, 36, 41 S.Ct. 230.

This Court has followed these salutary rules in the following cases: United States v. Combs, 390 F.2d 426 (6th Cir. 1968); United States v. Bradt, 294 F.2d 879 (6th Cir. 1961).

The facts set forth in the affidavit of bias required the Judge to disqualify himself. He erred in failing to do so. These facts were augmented by what took place during the two years while the case was pending.

The Judge did more than simply make rulings in the case. According to the affidavit the rulings were influenced by bias; but even if not biased, they were clearly wrong, and they require reversal and a new trial.

The May 7th plan was appropriately designated as a "Racial Balance Plan." It was within the power of the Board to adopt such a plan, although not constitutionally required, and absent a finding of constitutional violation, it is not within the authority of a federal court. Swann v. Board of Education, 402 U.S. 1, 10, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In Swann the Court stated:

> Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems

contribute to disproportionate racial concentrations in some schools. (*Id.* at 23, 91 S.Ct. at 1279)

The Court further stated:

If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command, to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. (*Id.* at 24, 91 S.Ct. at 1280)

See also Milliken v. Bradley, 418 U.S. 717, 740, 94 S.Ct. 3112, at 3125 (1974), and Winston-Salem Forsyth County Board of Educ. v. Scott, 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971).

Since the Board in the first place was not required to adopt a racial balance plan it certainly had the right to rescind such action if it later determined that such action was inadvisable at the time. The rescinding resolution would merely be neutral action. Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); Ranjel v. City of Lansing, 417 F.2d 321 (6th Cir. 1969), cert. denied, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390, rehearing denied, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970). Yet the District Court held that the rescinding resolution was a *per se* violation of the Constitution. This holding finds no support in the decided cases.

Thus in *Swann,* Winston-Salem Forsyth County Bd. of Educ. v. Scott, and Milliken v. Bradley, it was made clear that there is no constitutional duty on the part of the Board of Education to balance the races in each and every school in the system regardless of where the children live.

We have ruled to the same effect in Deal v. Cincinnati Bd. of Educ. [Deal I], 369 F.2d 55 (1965), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), aff'g 244 F.Supp. 572 (S.D.Ohio 1965); Deal v. Cincinnati Bd. of Educ. [Deal II],

419 F.2d 1387 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971).

In Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1973), rev'd sub nom., Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (July 25, 1974), the majority undertook to distinguish Deal I and Deal II on the ground that the District Judges in *Bradley* and *Deal* adopted different findings of fact. This is a real anomaly because our Court approved these inconsistent findings in the appeals therefrom with the result that acts which are constitutional in Cincinnati are unconstitutional in Detroit.

It should be noted also that the three dissenting opinions in Bradley v. Milliken pointed out a number of other violations of the constitutional rights of the defendants which the Supreme Court did not reach because of its holding that there was no basis for an inter-district remedy.

Whether bound by our decisions in Deal I and Deal II, the majority is bound by the plain language of Chief Justice Burger in *Swann, Milliken,* and *Winston-Salem Forsyth County Bd. of Educ.,* supra, relating to racial balance or quotas.

In my opinion the forced busing of black and white children away from their neighborhood schools, to achieve racial balance in each and every school in the system, where eligibility therefor is determined solely by the color of their skin, and over the objection of their parents, is fundamentally wrong and is not required nor even permitted by the Fourteenth Amendment to the Constitution. All that *Brown* held was that it was a violation of the Constitution to exclude black children from public schools attended by white children.

As previously pointed out, the great state of Michigan did not wait for *Brown* to be decided to accord relief to black children. No black child has been excluded from a Michigan public school for over one hundred years. It was wrong for the Court to treat this case as involving de jure segregation.

It is a well-known fact that many parents of black and white children do not want their children to be forcibly bussed away from their neighborhood schools to achieve a racial balance in each and every school in the system. They do not want their children to be used as pawns to effect an integration of the races, nor for the courts "to attain a social goal [which society has been unable to accomplish] through the educational system, by using law as a lever." [3]

It is submitted that the federal courts can act in school cases only to remedy constitutional violations, and that they are not authorized to be used as tools to effect social goals which society has been unable to attain. At the Black Political Convention, held in Gary, Indiana in March, 1972, mandatory busing and school integration were condemned as racist and as preserving a black minority structure.

If it is desirable to effect an integration of the races, we should start with adults rather than with little children. It could not be forcibly accomplished, however, by legislation or by judicial fiat, because our Constitution guarantees freedom of association to all persons. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Little children are persons.

Black and white children have equal constitutional rights. These rights should not be impinged in order to accord relief to plaintiffs in school cases. The forced busing of white and black children to achieve racial balance can lead only to an unfortunate polarization of the races.

The Board of Education cannot be faulted for the concentration of black people in certain areas of the city. The black people voluntarily moved into these areas long after the school district and attendance zone lines had been established. The Board had no constitutional duty to eradicate the concentration of population. The Board of Education, representing 17,285 school children, was entitled to better treatment than it received in this case. Under our Constitution even the most despicable person charged with a heinous crime is entitled to a fair trial.

In the closing paragraph of Knapp v. Kinsey, *supra*, we stated:

> In our opinion, the conduct of the District Judge did not conform to the standard required by the foregoing authorities. Whether unconsciously or otherwise, he failed from the start of the trial to view this case with the impartiality between litigants that the defendants were entitled to receive. (*Id.* 232 F.2d at 467).

I would reverse the judgment of the District Court and remand for a new trial before another Judge.

---

**3.** See dissenting opinion of Judge Weick in *Bradley, supra,* 484 F.2d p. 261.